# HUNTTING ELEVATOR COMPANY *v.* BOSWORTH, RECEIVER OF THE CHICAGO, PEORIA AND ST. LOUIS RAILWAY COMPANY.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

No 12. Argued October 24, 25, 1899.—Decided December 17, 1900.

This case involves deciding whether the defendants in error are liable for the damage occasioned to certain property, resulting from a fire which occurred on October 28, 1894, in a railroad yard at East St. Louis, Illinois. At the time of the fire Bosworth was operating the railway as receiver. The decision depends largely, if not entirely, on facts, which are stated at great length by the court, both in the statement of the case, and in its opinion. These papers are most carefully prepared. While both deal with facts, those facts are stated with clearness, with fullness, with completeness, and with unusual care. They leave nothing untouched. Without treating them with the same fullness, the reporter feels himself unable to prepare a headnote which could convey an adequate and just account of the opinion and decision of the court. Under these circumstances he deems it best not to attempt an impossibility, but to respectfully ask the readers of this headnote to regard the opinion of the court in this case as incorporated into it.

THIS case involves deciding whether the defendants in error are liable for the damage occasioned to certain property, resulting from a fire which occurred on October 28, 1894, in a railroad yard at East St. Louis, Illinois.

The Chicago, Peoria and St. Louis Railway Company, at the date of the fire in question, was being operated by a receiver appointed on September 22, 1893, in foreclosure proceedings instituted in the Circuit Court of the United States for the Southern District of Illinois.

On the assumption that the receiver was responsible for the damage occasioned by the fire above referred to, various persons and corporations who had suffered loss filed their interventions, asserting a liability on the part of the receiver for such damage. The intervenors were nine in number, and all but

two sought recovery for the loss occasioned by the damage or destruction of barley. The claims other than for barley were asserted by the Chicago, Milwaukee and St. Paul Railway Company, and the Carr, Ryder and Engler Company; the former corporation asking to be allowed for the value of its cars, in which were contained the destroyed or damaged barley, while the latter corporation demanded the value of certain doors, sashes, etc., consigned to Birmingham, Alabama. A list of all the intervenors is given in the margin.[1]

The interventions which related to barley shipments alleged delivery of the cars of barley to an initial carrier, consigned to a named commission merchant in St. Louis *via* East St. Louis; the delivery of the barley so shipped to the receiver of the Peoria Company to be "transported to its destination;" the carriage by that company as far as East St. Louis, and the damage by fire of the barley in the cars "while the same were still in transit and on the way to destination, and in the possession and under the control" of the receiver of the Peoria Company. In the answers filed by the receiver there was no denial of the allegations contained in the intervening petitions as to the shipment of the barley in question and the destination thereof. The answers, in effect, merely averred that after the receipt of the cars and contents by the receiver, they were delivered by him, in the due course of business, to the Terminal Railroad Association of St. Louis, and were damaged or destroyed while in the possession of that association and by its negligence.

It was alleged that the delivery to the Terminal Association had been made by virtue of a contract between the receiver and the Terminal Association, of date June 1, 1891, which contract was annexed as a part of the answer; and that by the custom and course of business existing between the receiver and the Terminal Association for four years prior to the deliveries in question, it resulted that the Terminal Association and not the

---

[1] Names of the intervenors: The Carr, Ryder and Engler Company; The Chicago, Milwaukee and St. Paul Railway Company; The S. H. Hyde Elevator Company; The W. W. Cargill Company; Jacob Rau; Gilchrist & Company, a partnership; The Huntting Elevator Company; McMichael & Son, a partnership; and Henry Rippe.

receiver was bound for the damage which the fire had brought about.   The receiver, moreover, filed a cross petition praying that the Terminal Association be made a party defendant to the intervention proceedings, so that its liability to the intervenors might be decreed.   Upon this application the court issued a rule upon the association to show cause why it should not be made a party defendant as prayed.   To this action, the Terminal Association appeared, solely for the purpose of objecting to the jurisdiction, and moved to discharge the rule for various reasons, all of which addressed themselves to the want of power to compel the appearance of the Terminal Association as a defendant to the interventions.   The cross petition, rule and the motion just referred to were not thereafter pressed upon the attention of the court, and the Terminal Association never appeared as a party to the intervention proceedings.

When the issues on the interventions were thus made up, the court referred the claims of all the intervenors to a master to take testimony and report.   Under this reference the testimony as to all the interventions was taken together.   During the course of the taking of the testimony before the master, it having developed that the propinquity of a warehouse filled with hay was the proximate cause of the fire, the intervenors added to their petitions the following allegations, as "a further, separate and distinct ground of recovery therein," viz:

"That upon the arrival of the cars mentioned and described in said petition at said East St. Louis, and while the same were still in the possession of said receiver, said receiver negligently caused and permitted them, together with their contents, to be placed upon certain tracks in close proximity to a large wooden warehouse filled with baled and loose hay, and through which said warehouse locomotive engines were frequently passing and repassing during all hours, night and day; that said wooden warehouse was open at the sides and ends, and had railroad tracks passing through it, over which locomotive engines frequently passed, and said hay was generally exposed to fire escaping from said locomotives; that said warehouse and hay was easily ignitible, and on account of the inflammable condition of said hay, the large quantity thereof, and the dimensions of

said wooden warehouse, the same, if set on fire, would burn with great rapidity and produce a great conflagration, all of which the receiver well knew, yet notwithstanding all this he negligently and carelessly caused and permitted said cars and their contents to be placed upon said side track, near said warehouse, and to remain thereon for several days, when said hay and warehouse were in some manner set fire to, and the same burned so rapidly, and produced such a large conflagration, that said cars and their contents were damaged and destroyed, as stated in said several petitions, and the petitioners damaged in the manner and to the extent and amount, as therein stated."

Prior to the filing of the amended petitions of the intervenors as above stated, the testimony before the master had shown that there was keen competition for the carriage of barley and other commodities from points in Iowa, Wisconsin and Minnesota, between roads entering St. Louis from the west side of the river and those which carried freight from the territory named into St. Louis *via* bridge or ferry connections from East St. Louis. Indeed, it was shown that in order to get a proportion of the business the roads on the East St. Louis side of the river were obliged to furnish dealers with facilities equal to those which could be obtained from roads entering St. Louis on the west side. For this purpose a joint through rate to St. Louis for barley was made, and on the arrival of the barley at East St. Louis, unless the consignees had previously directed to the contrary, instead of being immediately transferred across the Mississippi River for delivery to the consignees in St. Louis, it was held in the cars at East St. Louis to enable the consignees to dispose of the same in carload lots; and when so disposed of the cars were either delivered in St. Louis or transferred for shipment elsewhere, as might be ordered by the consignees. To such an extent did this custom prevail that it was testified that East St. Louis had become the market place for barley consigned from the territory named to St. Louis.

On the hearing before the master, after the testimony on the subject just stated had been introduced, an offer of proof and stipulation respecting same was made, to which we shall now call attention. In presenting a motion for a continuance of the

hearing, on the ground that he had been unable to procure the attendance of Mr. Teichman and other commission merchants of St. Louis, counsel for the receiver said:

" We expect to prove by these witnesses that the St. Louis Terminal Railroad Association personally solicited this particular barley business, originating on the Chicago, Milwaukee and St. Paul road, on which this controversy is pending; that these solicitations by the Terminal Railroad Association were made to all the barley dealers in St. Louis, to whom the particular consignments of barley are made, which are now in litigation; that the Terminal Railroad Association, as an inducement to barley dealers and shippers, agreed to hold the cars on their tracks at East St. Louis free of car service, and offered other facilities in and about their yards at East St. Louis, by which the St. Louis Terminal Railroad Association succeeded in securing the business of all of the shippers; by that term, I mean the consignees and shippers except the business of the John Wall Commission Company, whose business was being handled by the Wiggins Ferry Company, a competing line with the St. Louis Terminal Railroad Association, and that at a later day they also secured the business of this last-named firm. And that the solicitation was made in the interest of the Terminal Railroad Association for the express purpose of having the business sent down the east side of the Mississippi River, so as to give them the benefit of the transfer across the river from East St. Louis to St. Louis, in competition with lines west of the Mississippi River."

In the record is next set out the following statements of counsel for the intervenors :

Counsel for intervenors :  .  :  .  " Now in reference to the testimony of people at St. Louis, in respect to the arrangement made by the Terminal Railroad Association, by which it would hold these cars of barley and so forth, rather than to postpone this hearing at this time I will consent that the witnesses, if here, would testify as Mr. Wilson has stated. So I do not think a continuance should be granted on that application.

\*      \*      \*      \*      \*      \*      \*      \*

" To expedite matters, it is stipulated that the witnesses Otto Teichman, Henry Grieve of the John Wall Commission Com-

pany, L. Leinke and Charles Orthwein, at St. Louis, if present, would testify substantially as has been stated by Mr. Wilson."

Leave having been granted the receiver to answer the amended petitions, he met the new averments respecting the warehouse contained in the amended petitions, by denying that, while in the possession of the receiver, the latter negligently caused or permitted the property in question to be placed in proximity to the warehouse referred to in the amended petitions, and further averred that after the delivery of the cars to the Terminal Association the receiver no longer controlled and directed the placing of the cars in the yards of the Terminal Association. It was also denied that the receiver had any knowledge of the dangerous character of the warehouse.

So also in the amended answer, doubtless to be able to avail himself of what was deemed to be a defence arising from the testimony as to the custom of detaining shipments of barley, the offer of proof and the stipulation above referred to, the receiver set up a new defence, stated in his answers as follows:

" This receiver, further answering, avers that all of the said intervening petitioners had knowledge, through their consignees, of the condition of affairs that existed in the yards of the said railroad association prior to and at the time said cars and contents were damaged and destroyed.

" This receiver, further answering, avers that the cars and contents mentioned in the said intervening petitions after being placed remained in close proximity to said wooden warehouse until the same were damaged and destroyed, with the full knowledge, approval and consent of the said intervening petitioners, through their agents, their respective consignees; and in fact thus remained for the convenience of said consignees, and at their risk."

In the mean while, as by the proof which had been already introduced before the master, it was shown that the relations between the Terminal Association and the receiver, at the time of the fire, were not controlled by the contract of 1891, which the receiver had annexed to his answers, but were governed by a contract made on August 1, 1892, which had been produced on the hearing before the master, the receiver, in his amended

answer, admitted in effect the error of the averment of his original answer, and conceded that the controversy, in so far as controlled by the contract, depended upon the one made in 1892.

After the conclusion of the testimony the master, in a careful opinion reviewing the law and the facts, reported substantially in favor of the claims of all the intervenors. The testimony which had been taken as to all the interventions was embodied in but one report, that upon the intervention of Jacob Rau, and was referred to in the reports filed upon the other claims.

After hearing on exceptions filed by the receiver to the reports of the master, the court overruled the exceptions, affirmed the reports and decreed the liability of the receiver to the intervenors. An appeal was taken to the Circuit Court of Appeals for the Seventh Circuit, not only by the receiver, but, by leave of the court, the Chicago, Peoria and St. Louis Railroad Company—which had become the owner of the Peoria Railway, as assignee of the purchaser at a foreclosure sale—also perfected an appeal. In the Circuit Court of Appeals the decrees of the Circuit Court as to all but one of the intervenors were reversed. The appellate court, however, was divided in opinion as to the reasons for its action in the cases which were reversed, such division of opinion being upon the deductions to be drawn from the evidence, one judge concluding that the Circuit Court erred upon grounds stated in his opinion, while another member of the court, who concurred in the conclusion that the court below had erred, assigned different reasons. A third member of the court dissented because he thought the court below had deduced proper inferences from the proof in the cause. 56 U. S. App. 274; 87 Fed. Rep. 72. Thereupon a writ of certiorari was granted by this court.

*Mr. Burton Harrison* for petitioners in *Jacob Rau* v. *Bosworth*, the Huntting Elevator Co., the Chicago, Milwaukee and St. Paul Railway Co., and for Bosworth, receiver. *Mr. George R. Peck* and *Mr. George P. Cary* were on his brief.

*Mr. Bluford Wilson* for Bosworth. *Mr. Philip Barton Warren* was on his brief.

Mr. Justice White, after making the foregoing statement, delivered the opinion of the court.

A solution of the issues which arise on this record involves only an analysis of the facts for the purpose of ascertaining the true inferences to be drawn therefrom. In the statement of the case which we have just made we have given an outline of the origin of the controversy and have referred to the facts only so far as essential to elucidate the pleadings. We propose now to review the facts upon which the controversy turns. The testimony to which we shall refer in doing so is contained in the record of the case of *Jacob Rau* number 13 of this term, as in taking the appeals, following the course adopted by the master in making his report, the testimony as to all the interventions was brought up in that case only, and as found in that record has been treated in the argument as applicable to all the interventions.

The Terminal Railroad Association of St. Louis, which will be hereafter, for brevity, styled the Terminal Association, possessed in the city of East St. Louis extensive tracks, yards and facilities for the purpose of successfully carrying on the railroad traffic which came to that point. It was connected with and operated lines of railroad running across two bridges, leading to St. Louis, Missouri, and had many transfer tracks in its railroad yards, which were connected not only with its St. Louis tracks, but with the lines of various railroads which reached East St. Louis from different points. The Terminal Association, therefore, controlled the transfer of railroad business arriving at East St. Louis for St. Louis, and from St. Louis to East St. Louis, thence to other points, except to the extent that both of these classes of business were competed for by the Wiggins Ferry Company, a corporation owning and operating a transfer ferry between East St. Louis and St. Louis, which latter company also possessed terminal facilities in East St. Louis.

The Chicago. Peoria and St. Louis Railway, which we shall

hereafter for brevity refer to as the Peoria Company, even when considering the acts of the receiver of that company, operated a line of railroad between Peoria, Illinois, and East St. Louis, in the same State. It commenced business at East St. Louis about January, 1891. The terminus of its main tracks to the latter place was at a point termed Bridge Junction, at a street known as Stockyards Avenue, which was either beyond the city limits, or, if within the city limits, was on the outskirts thereof. At the point where the track of the Peoria Company thus terminated, that road possessed no terminal facilities of any kind for the handling of its freight business. It had no warehouses, no side tracks, no switch engines and no conveniences for the switching or handling of its freight trains. The road therefore was in a position where it was practically impossible for it to handle freight destined for East St. Louis or for carriage beyond that point, and in order to enable it to discharge its duty as a common carrier as to any such business it was absolutely necessary for it to make some arrangement for that purpose. It is true that the Peoria Company had a small freight house on the river front, with one or more side tracks adjacent thereto, which were utilized for the loading and unloading of local freight. But neither this freight house nor the tracks in question were directly connected with the main tracks of the road. To make such connection it was essential therefore for the Peoria Company to use the tracks of some other railroad.

The Peoria Company thus being substantially without any terminal facilities whatever for freight business at East St. Louis, that company as early as June 1, 1891, entered into an agreement with the Terminal Association to supply such deficiency. In August, 1892, the agreement made in 1891 was modified, and governed the relations of the parties when the fire took place. A copy of this agreement is in the margin.[1]

---

[1] Memorandum of an agreement, made this first day of August, A. D. 1892, by and between the Terminal Railroad Association of St. Louis, party of the first part, and the Chicago, Peoria and St. Louis Railway Company, party of the second part, witnesseth:

That whereas, the party of the first part undertakes to give the party of

Under this agreement, the incoming freight trains arriving at the terminus of the main track of the Peoria road as above stated were handled substantially as follows:

The Peoria train was stopped on a Y track. There the Peoria

---

the second part terminal facilities at East St. Louis, Illinois, for the handling of its trains, care of its engines and cars, and the handling and care of its freight, under the following terms and conditions:

First. It is agreed that the party of the first part shall furnish the necessary yard room and track facilities in their yards in East St. Louis, Illinois, as now located, and the necessary switch engines and yardmen to do the switching of the party of the second part, in the making up and breaking up of all freight trains that depart from and arrive at East St. Louis, and to furnish storage room for a reasonable number of cars necessary to properly take care of and handle the business of the party of the second part, not exceeding one hundred and fifty (150) cars at any one time; and the charge for the facilities and the work above named shall be at the rate of fifty cents (50) per loaded car in and out, except cars on which the party of the first part receives a bridge toll, which will be handled free; empty cars in and out free.

Second. Cars made "bad order" by and during the making up and breaking up of trains of the party of the second part to be repaired by the party of the second part, and the party of the second part shall furnish its own car inspectors.

All cars made "bad order" outside of the yards set aside for the use of the party of the second part shall be repaired by the party causing the damage.

Third. For all loads to and from the National stock yards the party of the second part is to pay the party of the first part one (1) dollar per car in and out, inclusive of the charge for making up and breaking up of trains, but not the trackage charge at National stock yards.

Fourth. All cars consigned to and from the East St. Louis freight house of the party of the second part to be switched to and from the Wiggins transfer tracks without extra charge. Regular switching charges and rules to apply on all other cars to and from connections, the party of the first part to be governed in making its collections by instructions shown on billing to it as to who should pay. In the absence of any instructions, the switching charges will follow the car.

Fifth. The party of the first part to furnish track room upon which the engines of the party of the second part can be switched and cared for and turned, as may be required; the care of such engines to be under the supervision of the party of the first part; the price for the service rendered to be agreed upon by the master mechanic of the party of the first part and the superintendent of motive power and machinery of the party of the second part.

engine was detached and was placed on a stub track reserved for the purpose. A switch engine of the Terminal Association then took hold, broke up the train and distributed the cars on the tracks set apart for the Peoria Company under the agreement.

The evidence shows that the place assigned for the use of the Peoria Company by the Terminal Association, in compliance with the contract, was a particular portion of the yard of the latter corporation, viz., eleven tracks, numbered from 40 to 50, and that these tracks were commonly used for such purpose. This latter fact was expressly admitted by the receiver in a stipulation made during the taking of testimony before the master on the interventions, in subdivision numbered 2 of which it was agreed that the cars and other property were damaged by the fire in question " while on the tracks of the Terminal Railroad Association of St. Louis in its yard at East St. Louis, *commonly used by the receiver herein under the agreement between said association and the Chicago, Peoria and St. Louis Railway Company, dated August 1, 1892.*" Though the stipulation referred to was amended in January, 1896, on motion of the receiver, by the elimination of certain admissions contained therein, which it was asserted had been discovered to be incorrect, no attempt was made to seek a correction of the stipulation so far as respected the use of the deposit tracks.

Besides the freight trains coming into East St. Louis from the main track of the Peoria road, as above stated, they were brought to the aforesaid deposit tracks the empty as well as

---

This contract to be in force from and after the 1st day of August, 1892, and to continue for six months from that date, and to be renewed from time to time, as desired, at the expiration thereof, if satisfactory to both parties.

In witness whereof, the parties hereto have caused the same to be executed in duplicate this——day of——, A. D. 1892.

TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS,

By J. O. VAN WINKLER, *General Superintendent.*

Attest:————, *Secretary.*

CHICAGO, PEORIA AND ST. LOUIS RAILWAY COMPANY,

By W. S. HOOK, *President.*

Attest: MARCUS HOOK, *Secretary.*

the loaded cars of the Peoria road, coming from the freight house above referred to, and also the loaded or empty cars destined for the Peoria Company from other points and coming into East St. Louis over any other road connecting with the Terminal Association. On the tracks to which all these cars were taken substantially, therefore, all the freight business of the Peoria Company, whether it arose from dealings with the Terminal Association or with any other railroad corporation, was carried on, and there all the outgoing freight trains of the Peoria Company were made up. It followed also that the freight cars of the Peoria Company, whether inbound or outbound, whether destined to be carried to some ultimate point by the Terminal Association or intended for delivery by that association if carried over other roads, remained upon the tracks set apart in the yard of the Peoria Company until all such purposes could be accomplished. In other words, under the agreement, all the ingoing and outgoing terminal freight business of the Peoria Company was in effect ultimately handled by the Terminal Association, and the yard in question, as far as set apart, was necessarily a yard for the transaction of every variety of the freight business of the Peoria Company.

The tracks thus set apart under the agreement—that is, tracks numbered from 40 to 50—were capable of holding two hundred cars, whilst under the contract the Peoria road was entitled to storage room for but one hundred and fifty cars. The evidence disclosed that the Terminal Association, whenever it found it convenient to do so, utilized the surplus space for the deposit of cars not belonging to the Peoria Company. The receiver of the Peoria road and his employés (such as the local agent at East St. Louis and his assistants, car inspectors, car repairers, etc.) had access to the deposit tracks. A car used as a work shop by the car repairers of the Peoria Company was placed near to said tracks. The consignees had also ready access to the cars placed on such tracks. Over a portion of the deposit tracks—that is, numbers 42 and 43—passed a structure known as the transfer warehouse, a building some six hundred feet in length. On the night of the fire and some time prior thereto, this transfer warehouse was being used by a St. Louis corporation, under leave of

the Terminal Association, for the storage of loose and baled hay.

Such being the relations between the Peoria Company and the Terminal Association, we are brought to consider the particular shipments which give rise to the controversy in this case.

In September and October, 1894, by three distinct transactions evidenced by telegrams and letters, the Huntting Elevator Company, of McGregor, Iowa, sold to the Teichman Commission Company, of St. Louis, a large quantity of barley. Respecting the first purchase, the commission company, on September 15, 1894, wrote from St. Louis to the Huntting Company : " We have your telegram accepting our bid of 56c. net for 25,000 bushels sample barley, *to be shipped to us here via East St. Louis.*" Five days later the Huntting Company telegraphed to the commission company as follows : " We have yours of the 19th ; please wire us best offer on 10,000 or 20,000 of our No. 3 sample barley *delivered St. Louis.*" On November 1, 1894, the commission company telegraphed : " Sold twenty thousand No. 3 fifty-four net *via East St. Louis,*" and confirmed the telegram by a letter which read in part as follows : " We wired you sale to-day of 20,000 bus. your No. 3 barley at 54c. *net here,* to be shipped *via* East St. Louis." The third sale was effected on October 10, 1894, in the following manner : After a telegraphic offer of " fifty-five net five thousand McNalley sample " had been declined, the commission company telegraphed, " Bid fifty-six net, leaving small margin, *shipment via East St. Louis.*" The Huntting Company replied : " Accept five thousand Lime Spring barley." The barley was delivered to the Chicago, Milwaukee and St. Paul Railway Company—three cars at Lime Spring, Iowa, and seven cars at Prairie du Chien, Iowa. The freight was prepaid by the elevator company, and instructions were given to the agent of the Milwaukee company to forward the cars to the commission company at St. Louis, *via* East St. Louis.

At the time of the shipment in question no receipts were issued by the initial carrier to the shipper for the cars of barley so delivered. It is shown, however, that it was the invariable

custom of the agent of the railway company to fill out the blanks contained in a printed form of way bill, the pertinent portion of which form is inserted in the margin.[1]

A completed way bill accompanied each car, and in the case of barley consigned to a commission company in St. Louis, it would be recited that the car was "from" the named place of shipment "to East St. Louis," while in the column headed "Consignee and Destination" would be inserted the name of the consignee and the address "St. Louis, Missouri." And the testimony leaves no doubt that a way bill conformably to the course of business referred to accompanied each particular car of the shipments now under consideration.

The cars containing the barley in question were carried to Rock Island, and there delivered with the way bill to the Rock Island and Peoria Railroad Company. The latter road conveyed the cars to Peoria, and delivered them with the way bills to the Peoria and Pekin Union Railroad Company, a switching association, which delivered the cars and way bill to the Peoria Company. They were thence carried by the Peoria Company to the end of its main track, and were there put upon a Y track and carried to the place of deposit under the agreement as above stated.

The trains containing the cars of barley in controversy reached the end of the Peoria main track, and the cars in question were taken by the switch engine of the Terminal Association to the deposit tracks at the times following: 3 cars at 5 P. M., on Wednesday, October 24, 1894; 4 cars, (2 at 4 A. M., 1 at 1:45 P. M. and 1 at 8 P. M., respectively,) on Thursday, October 25, 1894; 1 car at 2:45 A. M., on Friday, October 26, 1894; and

---

[1] *Portion of Way Bill.*

Form 287¼.

### CHICAGO, MILWAUKEE AND ST. PAUL RAILWAY.

Car No.　　　　　　　Special Way Bill.　　　　　Way Bill No.

Whose Car,　　　　　from　　　　　to　　Date　　　189

This form must be used in all cases in billing Flour or Produce made from Wheat milled "in transit."

| Consignor. | Consignee and Destination. | No. of Pkgs. | Description of Articles. | Weight. | Rate. | Local Unpaid. | Adv. Charges. |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

2 cars at 1:45 P. M., on Sunday, October 28, 1894, (the day of the fire).

It is shown beyond dispute that when the train in which these cars were found was taken by the Terminal Association on the Y track to be conveyed to the customary place of deposit, the way bills which accompanied the cars were retained by the Peoria Company, and were not delivered to the Terminal Association.

On the evening of October 28, 1894, there were many cars of the Peoria Company standing on the tracks set apart for its use as above stated, among them those of the present intervenors which had been delivered at the dates previously mentioned. The general character of the cars of the Peoria Company which were in the yard is shown by the fact that on that evening two trains of freight cars outward bound over the line of the Peoria Company were made up and taken by it and carried northward. On the same night, shortly after eleven o'clock, a fire broke out in the southeast corner of the transfer warehouse, extending over a portion of tracks 42 and 43, as above stated. The proof unquestionably establishes that this warehouse, as we have already stated, was filled with hay, loose and in bales; that the warehouse was open at both ends in such a way as to create imminent danger of the igniting of the hay by sparks from passing engines, and that such engines engaged in the work of handling cars were traveling backwards and forwards on the tracks in the vicinity of the warehouse. The dangerous character of the building, as used at the time of the fire, is well stated in the answer of the receiver, as "a veritable fire trap." No reasonable inference can be deduced from the proof other than that the fire was caused by the igniting of the hay from the sparks of a passing locomotive. That the perilous condition of the warehouse was known to the Terminal Association is beyond controversy, since it was shown that the warehouse was leased by that company to the corporation which had stored the hay therein, for the purpose of doing so. That knowledge of the hazardous use made of the building was also known to the Peoria Company is likewise true, as it is shown that the agent of the Peoria Company observed the situation

some time before the fire, and that such official called the attention of representatives of the Terminal Association to the insecurity arising therefrom.

The conflagration destroyed eighty-three cars and their contents. Of these, thirteen were admittedly chargeable to the Terminal Association, either because they had been so dealt with by the Terminal Association as to clearly make it responsible for them, or were cars of the Peoria Company, for which that company had delivered way bills to the Terminal Association for the further movement of such cars, whereby they admittedly passed into the control of the Terminal Company.

Of the remaining seventy cars belonging to the Peoria Company one was filled with outbound freight destined over that road; the others were cars which had come in over the track of the Peoria Company at various times, and had been placed in the yard under the circumstances already mentioned.

With the foregoing facts in mind, we pause in order to state the conflicting deductions which the parties claim should be drawn from them. We do this, because if what is asserted by each side be accurately defined, it will enable us in our further examination of the facts to restrict our inquiry alone to those matters which are necessarily pertinent.

The contentions of the Peoria Company, in every possible aspect, are embraced in three propositions, viz.:

1. That the barley in question was consigned to St. Louis, and therefore the obligation of that company was to carry to the terminus of its line and there deliver to the Terminal Association for the completion of the transit; and that having, prior to the fire, delivered to the Terminal Association at the end of the line of the Peoria road, the responsibility of the latter company to the owners of the merchandise had ceased.

2. That even if the shipment was to East St. Louis only, as the Peoria Company, when the merchandise arrived at the terminus of its road at that point, had delivered the cars to the Terminal Association, that association thereafter held them, not for the account of the Peoria Company, but for the owners, and that this delivery by which the Terminal Association came into possession of the cars for account of the owners, was

sanctioned by the custom of trade as to barley shipments, and was moreover shown to have been expressly authorized by the offer of proof and the stipulation in connection therewith, which, as we have shown in the statement of the case, took place on the hearing before the master prior to the time when the amended answers to the Peoria Company to the amended petitions in intervention had been filed.

3. That as by the custom of trade as to barley, it was shown that such merchandise on the completion of the carriage to East St. Louis was there to be held for an uncertain period to wait the convenience of the owners until direction had been by them given for further shipment, it followed that after the arrival of freight at East St. Louis it was there retained by whomsoever it was held, not as a carrier, but for the benefit of the owners and to aid them in the transaction of their business, as their bailee; and that the Peoria Company was hence not responsible as a carrier under any view, and under the proof was not liable as a warehouseman. In effect, all the contentions of the intervenor rest upon a denial of these propositions.

When the two first propositions above stated are duly weighed, it is seen that although in some respects they contain different elements, in effect they both must rest upon an identical predicate of fact; that is, that the merchandise in question had arrived at East St. Louis and been there delivered to the Terminal Association. This becomes obvious when it is seen that the first proposition asserts a non-liability of the Peoria Company, because as a connecting carrier it had delivered the merchandise to the Terminal Association for further transportation, and that the second proposition rests upon the assertion that on the arrival of the merchandise at East St. Louis it had been delivered to the Terminal Association, which was, under the custom of trade and the offer of proof and stipulation above referred to, the agent or bailee of the owners. The different character in which it is charged that the merchandise was delivered to the Terminal Association, as stated in the two propositions, does not obscure the fact that both propositions essentially depend upon an assumption of fact common to both, that is, the de-

livery of the merchandise to the Terminal Association on its arrival at East St. Louis.

In order to dispose of the two first propositions we come then to consider whether the cars containing the barley, on their arrival at East St. Louis, were delivered, in the legal import of that word, by the Peoria Company to the Terminal Association; and it is perhaps unnecessary to observe that the consideration of this premise of fact will serve completely to dispose of every argument based upon the custom of trade by which cars were held at East St. Louis, and the assumed agreement of the Terminal Association with barley dealers as embraced in the offer and stipulation made in relation therewith. In its best aspect, the custom of trade was simply that the barley be held at East St. Louis by the company in possession of the same until the consignee gave an order for the completion of the transit. And in any view, the offer of proof and stipulation manifested but an agreement that as to consignments of barley which were solicited, the Terminal Association would conform to the course of dealing, and would, when the barley came under its control and possession, not exact a charge for car service. But neither the course of business nor the assumed agreement of the Terminal Association could possibly subject that association to a liability for merchandise before it came into its possession, at a time when it was held for the consignees and subject to their order, by another, and different corporation.

This leads us to determine what was the attitude of the respective parties, under the contract, to the freight trains of the Peoria Company which were taken by the switch engines of the Terminal Association and placed on the deposit tracks, set apart for the former company. The legal relation must depend upon the contract, as it is obvious that the Terminal Association was under no obligation, as a common carrier, to accept in train loads freight arriving over the Peoria road, with cars consigned to different points and over different connections, and to subject itself, as a common carrier, to the hazard of sorting out the cars contained in such trains, and this also without delivery to it of way bills showing the further destination of such cars. It is also equally obvious that under its duty as a com-

mon carrier the Terminal Association was under no obligation to allow the use of its yard for all the purposes of the Peoria Company, the handling of its incoming as well as its outgoing freight trains, whether of loaded or empty cars, and the furnishing of all the appliances necessary to do so ; and especially to allow a given number of freight cars of the Peoria Company to occupy a designated portion of the yard of the Terminal Association for such time and under such circumstances as the Peoria Company might elect.

Before coming to consider the text of the contract, the circumstances surrounding the parties at the time it was made and the exigencies which caused it to be entered into are rightfully to be borne in mind as means of interpretation if ambiguity exists. We hence recall the facts to which we have previously referred. When the contract was executed, although the Terminal Association possessed extensive terminal facilities at East St. Louis, the Peoria Company had no means whatever for handling the freight business coming in or going out of East St. Louis over its main line. It had neither yards nor switches nor switch engines at East St. Louis, nor any of the appliances or instrumentalities essential to enable it, if it received freight inward or outward bound, to discharge its duty as a common carrier. The purpose of the contract then was to bestow upon the Peoria road the facilities it absolutely required. As the tracks in the yard which the Peoria Company acquired, to carry on its business, were therefore the only terminal facilities which that company had, where its incoming and outgoing freight cars were received, and where all its freight trains were made up, to hold that the yard so far as set aside was not that of the Peoria Company, would be but to say that the Terminal Association and the Peoria Company had been merged into one corporation for the purposes of all the terminal business of the Peoria Company, or that the Terminal Association had become a guarantor to the shippers of freight over the Peoria road for all losses occasioned by the Peoria Company for which it was liable as a common carrier.

We come to a specific examination of the text of the contract. The preamble which announces the intention of the parties

in entering into the contract clearly rebuts the construction that the terminal facilities which it was agreed should be afforded to the Peoria Company were to be enjoyed by that company without any responsibility whatever resting on it; in other words, that it was to have the facilities which were essential to discharge its duty as a carrier, but that the Terminal Association was to bear all the risk of such enjoyment. This results since the preamble recites that the Terminal Association undertakes "to give the party of the second part," (the Peoria Company,) "terminal facilities at East St. Louis, Illinois, for the handling of its trains, care of its engines and cars, and the handling and care of its freight, under the following terms and conditions." Mark, the purpose is to give the Peoria Company "facilities," not to cause the Terminal Association to become responsible for the Peoria Company, whilst the latter was making use of the facilities given to it. The contract also expresses the purpose thus declared in the preamble—that is, that the facilities are to be furnished to the Peoria Company. The agreement is not that the Terminal Association will store cars for the Peoria Company, but that there is to be given to that company "storage room for a reasonable number of cars necessary to properly take care of and handle the business," (not of the Terminal Association, but) of the Peoria Company. The provision in the second paragraph is that "cars made 'bad order' by and during the making up and breaking up of trains of the party of the second part," (the Peoria Company,) "to be repaired by the party of the second part, and the party of the second part shall furnish its own car inspectors." This makes the meaning yet clearer, since it results that during the making and breaking up of trains all the risk continued to be on the Peoria Company. And this is cogently enforced by the stipulation which immediately follows, that "all cars made 'bad order' *outside of the yards* set aside for the use of the party of the second part *shall be repaired by the party causing the damage.*" That is to say, the contract whilst casting the risk on the Peoria Company during the making and breaking up of its trains, and whilst its cars remained in the yard set apart for the Peoria Company, applied a different rule outside of the yard, when by

an order given to the Terminal Association to move the cars for further transit or delivery they actually came under its control. It is to be considered also that the compensation provided in favor of the Terminal Association by the contract is wholly incompatible with the construction that all the cars in the yard set apart for the Peoria Company were from the mere fact of their deposit there to be at the risk of the Terminal Association. Indeed, the fourth article expressly contemplated that the movement by the Terminal Association of the cars from the yard set apart for the Peoria Company should depend on the orders issued by the Peoria Company in the form of way bills, since it provides: "The party of the first part" (the Terminal Association) "to be governed in making its collections" (for cars moved) "by *instruction shown on billing to it* as to who should pay."

From this analysis of the contract, it results that the obligations which it imposed were entirely in accord with the conception naturally suggested by the general considerations to which we adverted before approaching the text. For it will be observed that the several provisions of the contract clearly subject the Peoria Company to all the risk resulting from those acts which that company was obliged to perform as a common carrier before it could effect delivery to a connecting carrier, and on the other hand imposed upon the Terminal Association the risk arising after the performance of such acts. That is, as by the contract the Peoria Company was furnished the facilities for the execution of its obligations as a common carrier, it was submitted to the risk incident to the performance by it of its own duties, and the Terminal Association was subjected to the risk which would likely devolve upon it by a delivery by the Peoria Company after the latter had performed its own duty as a common carrier.

The dealings and conduct of the parties in executing the contract dispel all question as to the proper interpretation to be given it. The proof beyond any doubt establishes that the way bills which we have described, and a sample of one of which we have reproduced, accompanied the freight cars from the initial point to the terminus of the Peoria main tracks. When

the Peoria train was taken charge of by the switch engine of the Terminal Association in order that it might be broken up and the cars composing the train be placed in the portion of the yard set apart for the Peoria, these way bills were retained by the latter company. While the Terminal Association kept a full record of the cars received on its Y tracks from the Peoria Company, and of the particular track on which each car was ultimately placed, presumably in order that it might readily locate a car when it received orders for further movement, as the way bills were retained by the Peoria, the Terminal Company knew officially nothing of the final destination of the cars and as to where they were to be forwarded. It therefore was in a position where it could not move them until it received forwarding instructions or new way bills from the Peoria Company. The proof is that only on receipt of such new instructions or way bills would the Terminal Association card and switch out the cars from the deposit tracks of the Peoria Company, and ultimately deliver them to connections or destinations as ordered by the Peoria. It is established by the evidence, substantially without conflict, that the cars as placed on the tracks in the yard set apart, as above stated, continued to remain there, and were not subject to be moved by the Terminal Association by the orders of the consignee, or any other person, until instructions to do so were given by the Peoria Company. This fact was testified to by the receiver himself and his employés. Thus receiver Bosworth said that when a train of the Peoria Company was broken up by the Terminal Association and the cars put upon the tracks commonly used for the business of the Peoria Company, the cars were not moved by the Terminal Association until instructions to do so were given by the receiver, and that they were subject to the order of the receiver to that extent, and the Terminal Association would not have recognized any instruction that the consignee would have made directly to it. The local agent at East St. Louis of the Peoria road also testified, respecting shipments of barley consigned to commission merchants whose address would be stated merely as "St. Louis," that " *there are a great many of the cars* we have orders for before they arrive, giving us designated

points for delivery." Such cars, however, would be placed on the deposit tracks referred to, until the agent of the Terminal Association had received from the agent of the Peoria road a new way bill or manifest for the freight, indicating the precise destination; while cars of barley consigned as stated, for delivery in St. Louis, for which no orders for further movement were given by the consignees prior to the arrival of the cars, would be allowed to remain on the deposit tracks awaiting instructions to the Peoria Company from the consignee, such freight being, "as a rule, held for the accommodation of the consignee." In substance, this witness further said:

In the case of barley shipments, the time of detention on the deposit tracts would vary from two hours to the same number of months, depending upon whether instructions from the consignees had been received prior to the arrival of the cars, or upon the time, following the deposit of the cars, when the consignee would answer the notice sent to him and direct as to delivery.

Stapleton, the chief clerk of the local agent at East St. Louis of the Peoria road, testified on the subject as follows:

"The cars would come in and be placed on the tracks in the Terminal Association yard wherever they saw fit; we would take the way bill and notify the consignee that we had a car numbered so and so loaded with barley; 'Where do you want it?' That is about the substance of the notice; and at such time as he got ready he would send this notice back, endorsed on the back a great many times, 'Send this car to Hines' Brewery,' or 'Send it to Highland or some other point.' Then we take and make out a way bill; take that to Mr. Felps and take his receipt.

\*     \*     \*     \*     \*     \*     \*     \*

"With reference to Teichman's barley, we would sometimes have orders in our office, in advance of the arrival of the cars, what disposition to make of them; others we would n't. Those we did n't, when they came we sent Mr. Teichman notice that the cars were there, what shall we do with them? Virtually that is the substance; and he would, at his pleasure, advise us to send the car so and so, to Hines' Brewery, say. We would

make out a way bill for the car, consign it that way, and de-
liver it to Mr. Felps of the Terminal Association.

 *  *  *  *  *  *  *  *

"If a man would say 'Send this to Highland,' that would be
instruction to the Vandalia, but the Terminal Association would
handle it."

This testimony as to the relations existing between the
parties and the necessity for instructions from the Peoria Com-
pany or new way bills before the Terminal Association was
empowered to remove the cars standing in the designated yard
is well illustrated by the proof, which shows that on Octo-
ber 28, 1894, the day of the fire, among the cars belonging to
the Peoria Company, standing in said yard, there were twenty-
four cars which had been received at various times, and that on
that day for these twenty-four cars new way bills had been de-
livered by the Peoria Company to the Terminal Association
and the cars were moved by the latter corporation, and there-
fore escaped the fire.

In passing, we note how completely this proof refutes the as-
sumption predicated upon the assumed custom of trade, and the
offer of proof and stipulation, since it demonstrates that up to
the time of the giving of instructions to the Terminal Associa-
tion no relation between the Terminal Association and the con-
signees of the barley had arisen, and that the order of the con-
signees given to the Terminal Association as to the further
movement of the barley would have been wholly without effect
and worthless, without the giving of an order by the Peoria
Company to the Terminal Association on the subject.

In the course of the dealings between the roads a blank form
of order for the movement of the cars was prepared by the
Terminal Association, was delivered to the Peoria Company,
and was used in the dealings for the purpose intended. One of
these blanks was filled by an employé of the receiver during
the course of the hearing before the master and was put in evi-
dence. A copy will be found in the margin of the next page.[1]

It will be seen that the blank in question plainly manifests
that prior to the giving of the order the car referred to in the
document had not been transferred to the Terminal Association,

since it declares that the transfer to that company arises from the order which the paper contains.    Another very conclusive fact is likewise shown beyond dispute.    By the course of business followed by the Peoria Company that road, where it received cars from other roads, to be further transported, made to the carrier from whom such cars were received what are denominated " junction reports," that is, statements showing when the cars in question were delivered by the Peoria Company to another carrier, and hence passed from its control.    Now these reports thus made, in the course of the business, embraced cars which had been taken and placed in the yard after the Peoria Company had issued the new instructions or way bills to the Terminal Association.    Thus for the purpose of its dealings with the carrier from whom the cars were received, the Peoria Company, by its whole course of action, constantly avouched that the cars were in its possession and under its control while in the yard up to the time the order to move was given by it to the Terminal Association, yet the claim now asserted is that the cars had passed from the possession and control of the Peoria Company from the mere fact that they had been placed in the yard and before the order to move was given.

A yet further fact of great significance remains to be noticed. The Peoria Company carried one or more insurance policies upon property in its possession.    In an affidavit to proofs of loss furnished by the receiver to the insurance companies, verified by agent Calvert, in December, 1894, it was stated :

" During the night of October 28, 1894, a fire occurred on the track of the Terminal Railway Association Company at East St Louis, State of Illinois, (*said tracks being used by the Chicago, Peoria and St. Louis Railway Company,*) and burned the cars, and wholly consumed the property freight *in transit* in said

---

[1] Car No. 680.   Terminal Railroad Association of St. Louis.

C., M. & St. P.    Manifest of freight transferred.

From C. P. & St. L. R. R.   To Eads R. R.   Oct. 10, 1894.

| Consignor. | Consignee & destination. | Description. | Weight. | Charges. |
|---|---|---|---|---|
| C. M. & St. P. Wykoff. | Teichman Com. Co. 16th St. & Union depot. St. Louis, Mo. | Barley. | 30,000. | $51.00 |

cars, as set forth in statements attached hereto, and forming a part of this proof of loss." [Italics ours.]

The statement attached as part of the proofs of loss embraced the property, the value of which was subsequently demanded in the intervention proceedings. The proof of loss, while enumerating the claim of the Chicago, Milwaukee and St. Paul Railway for thirty-eight of its cars, which had been destroyed, however, contained no reference to seventeen of the cars of that company which had been but partially damaged and were repaired by the receiver without any intimation to the Milwaukee Company that the receiver was not legally required to bear such expense, although, as between the Terminal Association and the receiver, the latter claimed that the former was ultimately liable for such damage.

Concluding that at the date of the fire the merchandise in question had not been delivered by the Peoria Company and was in contemplation of law within its possession and control, the two first propositions are disposed of, and it remains only to consider the third, that is, even if the merchandise was in the possession of the Peoria Company at the time of the fire, by the custom of detaining the barley at East St. Louis for further orders, it was there held by the Peoria Company not as a carrier but as bailee, and under such relation the proof does not establish its liability. But the legal aspects of this proposition need not be considered, since it rests upon an assumption of fact which is unfounded, that the proof is insufficient to fix the responsibility of the Peoria Company, even although it merely held the merchandise as a bailee or warehouseman. We have seen that the amended interventions even under the hypothesis that the Peoria Company did not hold the goods at the time of the fire as a common carrier but as a warehouseman, plainly charged the liability of that company for the destruction of the property because of its negligence in and about the care of the goods. The facts which we have already stated as to the hazardous use of the warehouse and the actual knowledge of the Peoria Company of its condition, clearly sustains this latter ground, of the asserted liability of the Peoria Company. And even although the proof of actual knowledge by the Peoria Company, of the condition of the warehouse, be put out of view and weight be

given alone to the relation which that company bore to the tracks set apart for its use, and to its duty under the law to know the condition of the place where it stored the freight held by it, and the negligence which must be implied if no actual knowledge existed of the use made of the warehouse, from the presence of the officers and employés in that locality in the discharge of their duty, yet the liability of the Peoria Company in the capacity of warehouseman was clearly established by the proof.

Incidentally, it seems to be claimed in argument that the Huntting Elevator Company was not entitled to assert a right of recovery, because it was not the real party in interest. But we need not dwell upon this claim, as it depends upon the contention that the facts established a delivery of the merchandise to the consignees, a contention which has been fully disposed of by what has been previously said. And even if under the custom of trade by which the barley was retained by the Peoria Company at East St. Louis, it resulted that the Peoria Company became a bailee or warehouseman for the consignees, under such hypothesis the right of the Huntting Elevator Company to recover in the intervention proceedings is manifest. The proof shows that after the destruction of the barley by the fire in question, upon the demand of the consignees, the Huntting Elevator Company, in order to comply with its contracts of sale, replaced the damaged or destroyed barley. Under this state of facts, therefore, the Huntting Elevator Company became in effect the assignees of the consignees in respect to any claim which the latter might have asserted. Of course, nothing which we have said in the foregoing opinion or anything which will be contained in the decree which we shall render will preclude any right which may exist or be asserted by the Peoria Company against the Terminal Association for the loss occasioned by the fire in question.

*The decree of the Circuit Court of Appeals is reversed, and the decree of the Circuit Court of the United States for the Southern District of Illinois is affirmed.*

MR. JUSTICE BREWER did not hear the argument, and took no part in the decision of this cause.