MONTGOMERY LIGHT & POWER CO. v. MONTGOMERY TRACTION CO.

(Circuit Court, M. D. Alabama, N. D.   October 16, 1911.)

No. 303.

1. INJUNCTION (§ 58*)—SUBJECTS OF PROTECTION AND RELIEF—RESTRAINING VIOLATION OF CONTRACT.

A court of equity may by injunction restrain a violation of a negative stipulation in a contract, although the affirmative covenants may be of such a nature that they cannot be specifically enforced.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 111–113; Dec. Dig. § 58.*]

2. SPECIFIC PERFORMANCE (§ 6*)—CONTRACTS ENFORCEABLE—MUTUALITY.

The rule that a contract must be mutually enforceable to entitle one party to maintain a suit for specific performance does not necessarily require in every case that each party must have the same remedy against the other.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 9–11; Dec. Dig. § 6.*]

3. INJUNCTION (§ 59*)—SUBJECTS OF PROTECTION AND RELIEF—RESTRAINING VIOLATION OF CONTRACT.

A court of equity has jurisdiction of a suit to enjoin a street railroad company from arbitrarily refusing to perform a contract by which it bound itself to take all of the electrical power required in its business for a term of years from an electric power company at stated prices, so long as the power company commits no breach of its own agreement to furnish such power and would suffer irreparable injury from its breach by defendant.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 114–116; Dec. Dig. § 59.*]

In Equity. Suit by the Montgomery Light & Power Company against the Montgomery Traction Company. On demurrer to bill. Demurrer overruled.

The substance of the contract here involved and the allegations of the bill in reference to it are sufficiently stated in the opinion. On the filing of the bill a restraining order was issued prohibiting the defendant "from receiving, accepting, or using direct electrical current from any person, firm, or corporation other than the complainant until the further order of the court," and

requiring defendant on a day named to appear and show cause why a preliminary injunction should not issue. The defendant made such answer, and afterwards by consent, with the approval of the court, withdrew its answer in order to test the rights of the parties on demurrer to the bill. The following are the stipulations of the contract to which the court refers in the opinion, but does not set out at length. It will conduce to a better understanding of the questions discussed and decided in the opinion to give these parts of the contract verbatim, as embodied in the first, second, third, fourth, fifth, sixth, seventh, and eighth paragraphs of the contract. They are as follows:

"First. The Power Company agrees to sell and deliver on the switchboard in the Power Company's station in said city of Montgomery, state of Alabama, and the Street Railway agrees to purchase from the Power Company exclusively for the period of fifteen years from February 1, 1903, such direct electrical current, in quantity and voltage not exceeding 550 volts, as it may require for propelling, lighting and heating its passenger and freight cars, and other rolling stock, and also any cars and rolling stock of any other person or corporation which it may operate or control, or which it may permit to use its track, as the said Street Railway may, at any time, during the term of this contract require in and about said city and county of Montgomery, in the state of Alabama, and for such other purposes as the said Street Railway may require in and about parks, places of amusement, car-sheds, stations, offices, etc., owned, operated or controlled by it, or for its benefit—it being understood and agreed that no current thus supplied shall be sold or distributed by said Street Railway except for the purposes herein stated, and all of such current shall be used exclusively for the direct use of the said Street Railway as herein stated. Such current shall be delivered at all times continuously throughout the day and night, or any part thereof, as the said street railway may require.

"Second. The Power Company agrees that it will, at its own expense, install and equip such apparatus as may be necessary to furnish and deliver such current, in quantity as herein provided, required by said Street Railway for the use or uses herein stated, and also to furnish a liberal reserve capacity in apparatus, above the said requirements. The Power Company agrees that all apparatus for furnishing power shall be the best of its class, and shall be kept and maintained by the Power Company in such condition and so operated as to make the supply of such current as effective, satisfactory and reliable as possible. Each direct current circuit breaker shall be equipped by said Power Company with an automatic alarm to give an audible signal to the attendant when such circuit breaker is open.

"Third. Each of the parties hereto shall maintain upon the switchboard in the Power Company's said station, a Thompson Recording Watt Meter of suitable type and size to measure the total quantity of electrical current furnished under this contract, such meters shall be connected in series so that each, acting independent of the other, will measure the whole current. The Power Company and the Street Railway shall, jointly make readings of said meters triweekly, that is to say, Tuesday, Thursday and Saturday, and to keep the result of said readings in the office of the said Power Company, subject at all reasonable times to inspection by the Street Railway; both parties shall at all times have free access to read said meters. One of said meters shall be under the exclusive control of the said Street Railway, and the other under the exclusive control of the said Power Company, except as herein provided. If the two meters show a variation of more than five per centum in any one day, the Power Company shall thereupon immediately notify the said Street Railway thereof. Both meters shall then be calibrated by representatives designated by the parties hereto acting jointly, and shall be corrected at the joint expense of the parties hereto. The quantity of current for which the said Street Railway shall be charged in case of variation of said meters, shall be the average of the two quantities indicated by the two meters.

"Fourth. For the purpose of inspecting the apparatus, equipment and meters, the Street Railway shall, at all reasonable times, have access to said power station.

"Fifth. The Power Company shall, at all times during the period of this contract, maintain in condition for immediate operation a reserve steam plant of sufficient capacity, and properly equipped, to supply the current required by the Street Railway in the event of failure of water power or transmission lines; and in such event, such steam plant is to be put into immediate operation by the said Power Company so that the service to the Street Railway shall suffer the least possible interruption.

"Sixth. The Street Railway agrees to pay to the Power Company for such current as may be furnished and used hereunder, for the period of fifteen years from the date of February 1, 1903, one and one-half cents (1½) cents per kilowatt hour; provided, that if at any time during the term of this contract the said Power Company shall furnish any direct electrical current to any person or corporation engaged in the same business in which the said Street Railway is engaged, or in competition with the said Street Railway, at a price less than that just hereinabove provided, then in that event, the price to be paid by the said Street Railway hereunder shall not be in excess of that agreed to be paid by such other person or corporation. A statement showing the quantity of such current used, and amount due under this contract, shall be furnished the Street Railway on the first day of each month for the preceding month, and payment shall be made on the fifth day of each month for the current used during the preceding month. Should any such payment not be made at the expiration of fifteen days after the same shall have become due and payable, the Power Company shall have the right hereunder to discontinue the supply of said current, but the Street Railway shall not thereby be relieved from any obligation hereunder; but the Power Company shall not, however, discontinue the supply of said current if there exists any reasonable or bona fide controversy as to the correctness of the amount demanded of said Street Railway, or any other legal excuse for not paying the same, and the said street railway shall pay the amount admitted by it to be due said Power Company, and one-half off the difference so in dispute; such difference shall be submitted to arbitration, one arbitrator to be selected by the Power Company and one by the Street Railway, and these two shall select the third, if necessary and the payment made hereunder shall in no manner affect the claims or rights of either of the parties to this contract as to said difference, nor the payment of subsequent bills for power furnished by said Power Company.

"Seventh. The Power Company agrees that if the apparatus in its station should, at any time, be insufficient to supply the requirements of the Street Railway in a manner satisfactory to the said Street Railway, it will thereupon, as may be necessary, increase its installation of generating, transforming and accessory apparatus and other machinery sufficient to supply said current in quantity as herein specified satisfactory to the Street Railway.

"Eighth. It is mutually understood and agreed between the parties hereto, that said Power Company shall not be held responsible under the terms of this contract, for any failure to carry out the same, either in letter or in spirit, when prevented from doing so by an unavoidable destruction of its power houses, or by the acts of God or the public enemy, but it is understood and agreed that the said Power Company shall, in such event, repair the injury to its property and resume its duties hereunder, as early as it can be possibly done; and provided, further, that should the said Power Company fail, from any cause whatever, to carry out the terms of this contract or to furnish the current required hereunder from any other source for a period of ten days, the said Street Railway may, at its election, thereupon either terminate this contract or await the making of such repairs. Should the said Power Company fail or refuse to supply the current herein agreed to be supplied from any cause whatever, except when prevented from doing so by the act of God, or the public enemy, or the unavoidable destruction of its power houses, it shall, and does hereby agree to pay the Street Railway, as liquidated damages, the sum of $300.00, three hundred dollars per day of twenty-four hours, and at the same rate for any fractional part of a day, during the period of such failure; but nothing herein shall prevent the said Street Railway from pursuing any equitable right it may have to compel the supply of such current and the full performance of this contract.

Steiner, Crum & Weil and John R. Tyson, for complainant.
Ray Rushton and Gregory L. Smith, for defendant.

JONES, District Judge (after stating the facts as above). The demurrer, of course, admits the truth of all the facts well pleaded in the bill. We have then this case: The complainant, a quasi public corporation, engaged in the business of generating and supplying electrical current for lighting and power purposes to individuals and the public here, has a contract with the Traction Company, another quasi public corporation, engaged in the street car business, whereby the Power Company agrees, in substance, to sell and deliver for a certain price, and the Traction Company agrees to purchase and receive from it exclusively, for a period of 15 years, 7 of which have not expired, such direct electrical current as may be required for propelling its cars and those of any other corporation which it may operate or permit to use its tracks, and for lights for parks, places of amusement, offices, etc.

The complainant, immediately upon the execution of the contract, began to furnish, and the Traction Company to receive, the electrical current contracted for, and has expended some $200,000 in machinery and apparatus to enable it the better to carry out the terms of the contract, and has at all times faithfully lived up to the terms and provisions of the contract, and is ready, able, and desirous to carry out every stipulation of the contract until it expires, as required by its terms. The defendant Traction Company is about to discontinue receiving electrical current from the complainant and to take it from another source, in disregard of its contractual obligation, and without excuse for its breach.

If the Traction Company is permitted to do this, complainant will have no adequate remedy at law for the recovery of the damages it will suffer from the respondent's causeless breach of the contract. The extent of defendant's business, the lines it would construct or operate, the number of cars it would use, the conditions under which it would run them, the places of amusement it would operate, and the quantity of electrical energy it would consume, during the ensuing seven years of the life of the contract, are uncertain and speculative, and could not be recovered in an action at law. Irreparable injury would therefore be inflicted upon the complainant if the defendant be permitted to breach the contract without just cause, by refusing to take electrical power exclusively from the complainant. It would be a reproach to justice, under such circumstances, if a court of equity were powerless to intervene and charge the conscience of the defendant with the duty of not wantonly inflicting such irreparable injury upon the other party to the contract, and the court ought to prevent it, if it can give any relief, consistent with the settled principles of equity and the rights of the parties under the contract, as they themselves have therein measured and determined them.

Although counsel for respondent necessarily admit, in the present posture of the case, that there is no excuse for defendant's refusal to receive electricity from the complainant, they insist, notwithstanding,

that there is no equity in the bill, as the relief sought practically amounts to specific performance of the contract, extending over a term of years, requiring the exertion of skill and the performance of personal services, which the court would be compelled to supervise, and defendant could not have a decree against the complainant for the specific performance of the contract on its part; and further that the court cannot grant an injunction against the refusal to carry out the contract, for its unexpired term, when by its terms the acts of the parties might lawfully terminate it before the date fixed in the contract for its expiration. They further insist under the term of the contract, "that should said Power Company fail, from any cause whatever, to carry out the terms of this contract or to furnish the current required hereunder from any other source for a period of ten days, said Street Railway may, at its election, thereupon either terminate this contract or await the making of such repairs"; that the parties deliberately contracted that the Traction Company (the successor of the Street Railway Company) might judge for itself whether the contract had been violated, and has the right at its peril, if it judges wrongfully, to refuse to carry it out, and subject itself only to such damages as may be recoverable in a court of law; and that by preventing defendant from refusing to receive the current, in the face of the provisions of the contract, pending an investigation whether its refusal was wrongful, would be adding a term to the contract, and give the complainant a right against the defendant which the contract did not secure to it.

It suffices to say of this objection that, on demurrer, it is admitted that there has been no breach of the contract, and that the condition subsequent, upon which the defendant would have the right to terminate it, has not happened. Compelling the defendant to continue receiving the electrical current, therefore, could not possibly violate any legal or equitable right belonging to it. Besides, a court will not adopt any construction of a contract which permits a contracting party to take advantage of his own wrong to terminate it, or to inflict irreparable injury on the other party to the contract by wrongfully refusing to perform it, unless the terms of the contract are so plain and explicit to that effect that the court, in view of the situation of the parties and the subject-matter of the contract, is driven to the conclusion that such was the intention of the parties. It is apparent, from reading this carefully drawn contract with its numerous mutual covenants and stipulations, which go to the consideration of the contract as an entirety, that it was not contemplated that either party might terminate it, unless the facts occurred, upon the happening of which it was stipulated that the aggrieved party should have a right to put an end to the contract. It does not disclose any purpose that either of them, in the event the other attempted a wrongful breach of the contract, should be precluded from asserting any right, it might otherwise have, to resort to a court of equity to compel performance of the contract, and thus prevent the infliction of irreparable injury on the other party by a causeless breach of it.

It is true that the bill prays for a temporary injunction, and for

a final decree preventing defendant from accepting or using electrical power· from any other source than complainant pending the unexpired term of the contract, and that upon final hearing the injunction be made perpetual. Obviously, no court could grant such relief, regarding the performance of a contract which is liable to be terminated at any time by the default of the complainant. It could never be known, until the date the contract fixed for its expiration arrived, whether it would continue in force for the full term thus fixed, since it is liable to be terminated at any time by the default in its performance and the election given the defendant, in that event, to terminate it. There is, however, a prayer for general relief, as to the irreparable injury the complainant would suffer, if the court of equity does not afford such preventive relief as may be required in view of the situation disclosed by the bill.

The earlier authorities, and some comparatively late ones in this state, bear out the contention of the defendant that the court ought not to specifically enforce the negative covenant arising from the contract here, to take *exclusively* from complainant. The fundamental doctrines upon which courts of the United States administer equity must be the same in every state, and cannot be changed by state decisions or state statutes. Kirby v. Lake Shore R. R. Co., 120 U. S. 138, 7 Sup. Ct. 430, 30 L. Ed. 569. The decisions of the Supreme Court upon such questions necessarily control this court.

[1] It is said in 2 High on Injunctions, § 1164, that:

"While in cases of contracts containing both affirmative and negative stipulations the authorities are exceedingly conflicting and irreconcilable as to whether equity may interfere by injunction to prevent a breach of the negative covenant, when the affirmative is of such a nature that it cannot be specifically enforced by a judicial decree, yet the later and better considered doctrine is that equity may thus interfere to restrain the violation of the negative stipulation, although it cannot specifically enforce the affirmative one."

And the statement is sustained by the numerous citations in the notes to the text.

In Waterman on Specific Performance of Contracts, §§ 203, 204, p. 271, it is said:

"It has been observed, with particular reference to specific performance, that in the increasing complexities of modern business relations equitable remedies have necessarily and steadily expanded, and no inflexible rule has been permitted to circumscribe them. The jurisdiction of courts of equity is not now, therefore, confined in the narrow limits that once bound it; but the constant tendency has been to broaden their power, and especially has this been true in suits for specific performance."

Pomeroy, in his work on Equity Jurisprudence (section 769), says:

"The frequent statement of the rule of mutuality—'that the contract to be specifically enforced must, as a general rule, be mutual, that is to say, such that it might, at the time it was entered into, have been enforced by either of the parties against the other'—is open to so many exceptions that it is of little value as a rule."

Touching the same subject, he says in his work on Specific Performance (section 169):

"It is evidently based on no principle of abstract justice or right, but at most upon notions of expediency, and the arguments offered in its support are but mere repetition of time-honored verbal formulæ, which when closely analyzed are found to be of little or no force or meaning."

[2] A clear statement of the rule is found in Northern Central Railway Company v. Walworth, 193 Pa. 207, 44 Atl. 253, 74 Am. St. Rep. 683:

"The principle that contracts must be mutual, must bind both parties or neither, does not mean that in every case each party must have the same remedy for a breach by the other. Covenant may lie against one, where only assumpsit can be maintained against the other. * * * The mutuality required is that which is necessary for creating a contract on both sides in some manner, but not necessarily enforceable on both sides by specific performance."

Other courts have met the objection (when lack of mutuality is urged to the indirect enforcement of a contract by an injunction against the violation of the negative clause of the defendant's agreement) by a conditional decree (an injunction good so long as plaintiff continues to do his part, but dissolvable on his failure to perform). Though clearly lack of mutuality may exist in the terms of the agreement, inasmuch as some of the terms are unenforceable in equity, yet the final test shows that the remedy of a conditional decree does not leave the defendant to a legal remedy, as plaintiff must give performance as long as he receives it. See Pomeroy's Equity Jurisprudence, § 775, and the authorities in the note. The doctrine thus laid down has received the approval of the Supreme Court in three late cases, specifically enforcing contracts similar in character to that involved here. Franklin Telegraph Co. v. Harrison, 145 U. S. 459, 12 Sup. Ct. 900, 36 L. Ed. 776; Joy v. St. Louis Railroad Co., 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843; and Union Pacific Railroad v. Chicago Ry. Co., 163 U. S. 564, 601, 16 Sup. Ct. 1173, 41 L. Ed. 265. See, also, Donovan v. Pennsylvania R. R. Co., 199 U. S. 279, 26 Sup. Ct. 91, 50 L. Ed. 192; Walla Walla City v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341; Beck v. Indianapolis L. & P. Co., 36 Ind. App. 600, 76 N. E. 312; Columbia Ave. Sav. Fund v. City of Dawson (C. C.) 130 Fed. 153; and General Electric Co. v. Westinghouse Electrical Co. (C. C.) 151 Fed. 664.

In Re Lennon, 166 U. S. 548, 556, 17 Sup. Ct. 658, 661, 41 L. Ed. 1110, the jurisdiction of a court of equity to order an injunction to prevent an arbitrary discontinuance of a custom of two railroads to interchange traffic with another came under discussion, and the court said:

"Perhaps, to a certain extent, the injunction may be termed mandatory, although its object was to continue the existing state of things, and to prevent an arbitrary breaking off of the current business connections between the two roads. But it was clearly not beyond the power of a court of equity, which is not always limited to the restraint of a contemplated or threatened action, but may even require affirmative action, where the circumstances of the case require it."

In Union Pacific Railroad Co. v. Chicago Ry. Co., supra, the Supreme Court says:

"The jurisdiction of courts of equity to decree the specific performance of agreements is of a very ancient date, and rests on the ground of the inade-

quacy and incompleteness of the remedy at law. Its exercise prevents the intolerable travesty of justice involved in permitting parties to refuse performance of their contracts at pleasure by electing to pay damages for the breach. * * * It must not be forgotten that in the increasing complexities of modern business relations equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them. As has been well said, equity has contrived its remedies 'so that they shall correspond both to the primary right of the injured party and to the wrong by which that right has been violated'; and 'has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising and new kinds of wrongs constantly committed.' "

The court then quotes and approves what Pomeroy says (Equity Jurisdiction, § 111) in discussing the tendency of courts to indulge more liberality than formerly, by injunctive relief where contracts are involved.

[3] Under the authorities and in the light of reason, the court has no doubt of its jurisdiction to prevent the irreparable injury threatened by defendant's arbitrary refusal to receive the electric current, and that it is its duty to do so in the present posture of the case, to the extent of enjoining the defendant from refusing to receive the electric current until it has been judicially ascertained, by some tribunal, either in this court by the taking of proof or by judgment in some other court, that the defendant has the right to treat the contract as abrogated, because complainant has not performed it. If the court refuses to grant relief to that extent, and allows respondent to breach the contract, pending a dispute as to the right to do so, the complainant will suffer irreparable injury, if the contract is breached. On the other hand, if the respondent has the right to breach the contract, it will not suffer any irreparable injury by being prevented from refusing to take the current from the complainant until its right to do so has been ascertained. No such issue arises on the demurrers, but counsel have argued the case in the view that such an injunction might improperly prevent the defendant from getting its electrical current elsewhere, and cause it irreparable injury in the interval in which it was restrained, pending a decision as to the rightfulness of its contention.

Defendant cannot suffer irreparable injury in such event. Continuing to take the electrical current under the order of the court, if it turned out to be improper, the damage which it would suffer in the interval would not be speculative, and would be easily ascertainable and recoverable in an action at law. The occurrences which fix the measure of damages will all have taken place, while the contract is being temporarily enforced under the orders of the court, and their full measure could be ascertained and adjudged by a court of law on the dissolution of the injunction, or the court of equity might itself ascertain them if it be so provided in the order and bond exacted to authorize the issuance of the injunction. On the other hand, if the injunction be improperly refused, it would subject the complainant to irreparable injury, for it could not recover the full measure of the injuries inflicted upon it by a wrongful breach of the contract in an

action at law. In such a situation it is the duty of the court to preserve the status quo, until it can ascertain the facts which must determine whether the decree shall go for or against the complainant on the final hearing. Pending the dispute between the parties as to their respective rights, the court should make such decree as will save both the parties harmless, no matter what may be the final result, rather than make one which may irreparably injure one of the parties to the suit, if its contentions turn out to be correct. When the actual situation is disclosed by the answer and the complainant takes issue upon it, the nature of the relief which may be proper can better be determined. No order will be made now except that the demurrers be overruled, and that respondent, according to the agreement of counsel, file its answer within five days from this date.