MONTGOMERY LIGHT & WATER POWER CO. v. MONTGOMERY TRACTION CO.

(District Court, M. D. Alabama, N. D.   December 1, 1914.   On Motion for Modification of Final Decree, December 9, 1914.)

No. 303.

1. INJUNCTION ☞58—NATURE OF RELIEF—ENJOINING VIOLATION OF CONTRACT.

A court of equity may, where the facts of the case are such that equity requires such relief, restrain the violation of negative stipulations in a contract, when the affirmative covenants are of such a nature that they cannot be specifically enforced.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 111–113; Dec. Dig. ☞58.]

2. SPECIFIC PERFORMANCE ☞55 — CONTRACTS ENFORCEABLE — CONTRACTS AGAINST PUBLIC POLICY.

A contract between a street railway company and a power company, by which the latter agrees to furnish to the former the electric power to operate its cars, is not against public policy, as a delegation by the street railway company of a part of its duty to the public as a common carrier, in such sense that it may not be specifically enforced in a proper case.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 173–176; Dec. Dig. ☞55.]

3. CORPORATIONS ☞657 — FOREIGN CORPORATIONS — NONCOMPLIANCE WITH STATE LAW—VALIDITY OF CONTRACT.

Complainant, a power company, entered into contracts with two street railroad companies to furnish electric power for the operation of their cars for a term of years.   The two contracts were essentially alike, but differed in some of their provisions.   Subsequently defendant succeeded to the property and rights of both of the street railroad companies, and thereupon a new contract was made between complainant and defendant, abrogating one of the prior contracts, and recognizing the other as the one to be observed thereafter.   Held, that the fact that at the time the last contract was made complainant, which was a foreign corporation, did not have on file with the Secretary of State a designation of an agent on whom process could be served as required by the law of the state, did not render such contract invalid as a recognition and reaffirmance of the prior contract, and that the recognition and subsequent observance of such contract by both parties for a number of years rendered it binding on defendant.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2536–2541, 2550, 2552–2554; Dec. Dig. ☞657.]

On Motion for Modification of Final Decree.

4. APPEAL AND ERROR ☞80—FINALITY OF DECREE.

A decree for specific performance of a contract by which complainant agreed to furnish defendant with electric power to operate its street cars

for a term of years, to be paid for by defendant monthly, and also finding the amount due thereunder to the date of the decree and awarding execution therefor, is a final decree, from which an appeal lies, and is not rendered interlocutory by the fact that the cause is retained for the purpose of enforcing payment of such other sums as may become due under the contract, which provision is merely in aid of the execution of the decree for specific performance.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 429. 432, 433, 450, 456, 457, 494–509; Dec. Dig. ☞80.]

In Equity. Suit by the Montgomery Light & Water Power Company against the Montgomery Traction Company. On final hearing. Decree for complainant.

See, also, 191 Fed. 657.

Steiner, Crum & Weil and John R. Tyson, all of Montgomery, Ala., for complainant.

Rushton, Williams & Crenshaw, of Montgomery, Ala., and Gregory L. Smith, of Mobile, Ala., for respondent.

CLAYTON, District Judge. This cause is submitted upon the report of the special master and the exceptions thereto filed by the respondent, and for final decree upon the pleadings and proof.

The relief sought by the complainant, as shown by the original bill as amended and the supplemental bill, is to enjoin the respondent company, its officers and agents, from disconnecting its wires and lines from the power plant and wires of the complainant, and from receiving or using direct electric current, for propelling and lighting respondent's cars and for other purposes, from any person, firm, or corporation, other than complainant, under and in accordance with the contract entered into between the predecessors of the complainant and the respondent, respectively, on December 13, 1902. This contract provided that the electric current needed and used by the predecessor of the respondent should be obtained exclusively from the predecessor of the complainant. And it is also sought to have ascertained the amount due from the respondent to the complainant for electric current supplied by the complainant to the respondent since the filing of the original bill and for the month in which it was filed, and for decree requiring the respondent to pay complainant such amount ascertained to be due for electric current so supplied.

The complainant alleges that it has faithfully carried out its obligations to the defendant, imposed by the terms of said contract; that it had continued to do this from the beginning of the operation of the contract to the time of the filing of the bill; that the respondent had, since entering into the contract, accepted its performance; that said contract covered a period of 15 years, and that the unexpired portion of said contract was 7 years; that the complainant was able, ready, and willing to carry out and perform every obligation of said contract, and was desirous of so doing, but that, notwithstanding, the respondent, in disregard of the obligations imposed upon it by said contract, was preparing to discontinue the taking of electric current from the complainant, and that the respondent had the intention of disconnecting its

wires from complainant's power house and wires, for the purpose of taking the necessary electric current from the new power plant, which was then about completed in the city of Montgomery, and which was to be operated by the principal stockholder of the respondent; that unless restrained, as prayed for in the bill, the respondent would violate its contract with complainant, and discontinue the taking of electric current from complainant for the operation of its street cars; that respondent would receive its entire current, for the purposes provided in the contract, from the new power plant; and that if such acts, threatened by the respondent, were consummated, irreparable injury would be done the complainant, and so recurrent in its nature, and so uncertain of ascertainment, as to render inadequate any remedy in a court of law.

It is averred in the amended bill, and it is admitted in the answer, that the contract, the violation of which is sought to be restrained, was entered into December 13, 1902, by the Montgomery Light & Power Company, a West Virginia corporation, and the Montgomery Street Railway Company, an Alabama corporation. On January 8, 1903, the Montgomery Light & Power Company transferred and assigned to the complainant all the property, rights, franchises, and privileges owned by it, which assignment carried with it the contract made by the Montgomery Light & Power Company with the Montgomery Street Railway Company on December 13, 1902, and that on March 19, 1903, the complainant entered into a contract with the Montgomery Traction Company, an Alabama corporation, operating a street railroad system in and near the city of Montgomery, separately and distinct from the Montgomery Street Railway Company.

In the month of April, 1906, the several street railroad companies, which had entered into the contracts above mentioned, were consolidated into one corporation under the name of the Montgomery Traction Company. At that time the complainant was supplying to the several street railroad companies all the electric current used for their operation under the two contracts hereinbefore described, and after the consolidation complainant continued to furnish the electric current to the Montgomery Traction Company to January 31, 1909, and for the current so furnished rendered to the traction company bills, which were paid or settled monthly in due course of business. The two contracts, the one with the Montgomery Street Railway Company, entered into December 13, 1902, and the other with the Montgomery Traction Company, entered into March 19, 1903, were substantially the same so far as concerns the obligations from the power company to the street railroads. The only material difference between the two contracts is that in the latter the power company was to supply current of a voltage not exceeding between 550 and 600 volts, while in the former contract the voltage was not to exceed 550 volts, and, further, the former contract, that of December 13, 1902, provided for liquidated damages to be paid the street railway company, in the event the power company failed or refused to supply the current, in the sum of $300 per day of 24 hours, and at the same rate for any fractional part of a day, during the period of such failure; while in the second contract, that of March 19, 1903, it

was provided that for failure on the part of the power company to supply the traction company with current for more than 4 hours, in accordance with the terms of the contract, the power company would pay to the traction company the sum of $100 per day as liquidated damages "for each and every failure on its part, which sum the traction company is hereby authorized to retain and deduct from any payment that may be due or to become due to the power company hereunder."

On January 30, 1909, and after the consolidation of the street railroad companies, there was a contract entered into between the complainant and the consolidated company, the respondent here, by the terms of which it was—

"mutually agreed that the contract between the Montgomery Light & Water Power Company and Montgomery Traction Company, dated the 19th day of March, 1903, is hereby in all things canceled and annulled, and the present Montgomery Traction Company and the present Montgomery Light & Water Power Company, as they are now incorporated and as they now exist, hereby further mutually agree that the only contract in existence between them, as to the matters mentioned in either of said contracts, in the future shall be that certain contract entered into between the Montgomery Light & Power Company, to which the Montgomery Light & Water Power Company is the legal successor, and Montgomery Street Railway, to which the Montgomery Traction Company is the legal successor, and all the terms of said contract, as the same was originally written and agreed to, shall hereafter be binding and obligatory on each of the parties hereto."

And the contract contained this further provision:

"Nor does this contract in any way annul or affect or destroy any other contract between said companies other than the contract between the original Montgomery Traction Company and Montgomery Light & Water Power Company, dated March 19, 1903."

In the amended answer filed by the respondent the execution of the contracts is admitted.

Several grounds of defense were raised by the demurrers to the bill, and these have heretofore been considered and passed upon, as will hereinafter be more fully stated. In the answer the respondent interposed several defenses, which may be summarized as follows:

(1) That at the time the contract between the complainant and the respondent was made, on January 30, 1909, which provided that the contract of December 13, 1902, should be the contract under which complainant was to continue to furnish to the respondent electric current, the complainant, a foreign corporation, had not complied with the laws of Alabama, in that at the time of the making of said contract of January 30, 1909, there was not on file with the Secretary of State a certificate designating an agent at complainant's known place of business in Alabama, and that therefore the contract was void.

(2) That the complainant had failed continuously to furnish respondent with sufficient current for the operation of its street cars when there were unusual crowds in the city of Montgomery on occasions such as baseball days, circus days, fair days, or days of expositions in said city.

(3) That complainant had failed for 2½ years preceding the filing of the bill to install and equip its power plant with such apparatus as

was necessary to furnish and deliver to the respondent current in the quantity required by respondent's railroad system, and also had continuously for many years failed to furnish a liberal reserve capacity above the actual requirements of the street railroad system; that the apparatus employed by the complainant for furnishing power to the respondent was not in the best of repair, but was inadequate and ineffective.

(5) That for 2½ years preceding the filing of the bill the complainant had failed to so have its apparatus operated as to make the supply of current to the respondent, for its street railroad, satisfactory, effective, or reliable.

(6) That the complainant—

"during the fair of 1909, and during 1910, and for the first six months of 1911, violated said clause in said contract which provided that complainant should keep and maintain its apparatus and so operate the same as to make the supply of current to said street railroad effective, satisfactory, and reliable, in that during said time it failed to adjust the circuit breakers on the switchboard from time to time so as to permit the various circuits of defendant's feeder system to receive sufficient current for the operation of its cars, and on many occasions complainant's agents or servants, in charge of said switchboard, well knowing that there was a demand for current on said circuits, in excess of the setting of said circuit breakers, failed to raise the setting of said circuit breakers to enable the circuit so requiring additional current to receive the necessary current with which to propel the cars."

(7) That there was not at all times maintained by the complainant a reserve plant of sufficient capacity and properly equipped, in condition for immediate operation, to supply current required by respondent's street railroad in the event of the failure of the water power or complainant's transmission lines, but that, during the two years prior to the filing of the bill, complainant's plant was not a reserve plant, and that the power generated thereby was continuously used by the complainant for the purpose of generating current to be supplied the respondent, and that frequently all the power generated by both steam and water power plants was required to furnish sufficient current to supply the respondent for the operation of its cars, and that then the complainant had no sufficient reserve.

It was admitted in the answer that it was the intention of the respondent to discontinue the taking of electric current from the complainant, which intention, it was further admitted, and insisted by respondent, was occasioned by the continued breach of the contract on the part of the complainant in failing to supply sufficient amount of current to respondent. It was also admitted that the intention on the part of the respondent to discontinue the taking of electric current from the complainant would have been carried into effect, but for the restraining order of this court. It is contended by the respondent that, in carrying out this intention or purpose, the respondent was acting within its rights, and had, as a matter of fact, so far as it could do so under the restraining order of this court, notified the complainant of the termination of said contract.

The foregoing statement contains substantially the issues that were presented or raised by the pleadings in the cause at the time of the appointment of the special master and the order of reference. It will

be observed that in setting out the defenses (see paragraph 6) the amendment to subdivision (e) of paragraph 6 of respondent's answer is quoted. The amendment was filed December 10, 1913, and modifies to some extent subdivision (e) of paragraph 6 of the answer, as filed December 23, 1911.

The case was heard on demurrer to the bill by Judge Jones, whose great learning is appreciated and whose death is lamented by the court and members of the bar. Every question of law in the case presented by the record, except one, was well considered and decided by him. The one such question not specifically passed upon, but which is now insisted upon, is that the complainant did not have an authorized agent, as required by the Constitution and statute of Alabama on January 30, 1909, when the contract of that date was executed, and that such contract is void. But this will be considered hereafter.

In my opinion Judge Jones' conclusions, sustaining on demurrer the equities of the bill, are supported both by reason and authority. The style of the case is Montgomery Light & Water Power Co. v. Montgomery Traction Co. (C. C.) 191 Fed. 657.

[1] Whether or not a court of equity will by injunction restrain the violation of negative stipulations in a contract (in the instant case, enjoin the respondent from taking current from any source, except the complainant), where the affirmative covenants are of such a nature that they cannot be specifically enforced, is sometimes a difficult question, and it is not an easy matter to reconcile the decisions in adjudicated cases. However, it may not be too much to say that the seeming conflict is attributable to differences in the facts and circumstances of the particular cases. In Wesley v. Eells, 177 U. S. 370, 376, 20 Sup. Ct. 661, 664 (44 L. Ed. 810), the Supreme Court said:

"In Hennessey v. Woolworth, 128 U. S. 438, 442 [9 Sup. Ct. 109, 111 (32 L. Ed. 500)] this court said: 'Specific performance is not of absolute right. It rests entirely in judicial discretion, exercised, it is true, according to the settled principles of equity, and not arbitrarily or capriciously, yet always with reference to the facts of the particular case' [citing other cases]."

In the light of the authorities relied on by Judge Jones, in his opinion delivered in passing upon the demurrers in this case, and upon consideration of other cases, including those cited by complainant's and respondent's counsel, respectively, I am convinced that the bill in this case contains equity, and that, if the evidence sustains the facts averred therein, the complainant must be granted the injunctive relief prayed for. In addition to the authorities cited in the opinion of Judge Jones, I refer to the following: Central T. Co. v. Wabash, etc., Ry. Co. (C. C.) 29 Fed. 546; Texas Co. v. Central, 194 Fed. 1, 114 C. C. A. 21; Union Pac. Ry. Co. v. Chicago, etc., Co., 51 Fed. 309, 2 C. C. A. 174; Prospect, etc., R. Co. v. Coney Island, etc., Ry. Co., 144 N. Y. 152, 39 N. E. 17, 26 L. R. A. 610; Southern Ry. v. Franklin P. R. R. Co., 96 Va. 693, 32 S. E. 485, 44 L. R. A. 297; Schmidt v. L. & N. R. R. Co., 101 Ky. 570, 41 S. W. 929, 38 L. R. A. 809; Lumley v. Wagner, 1 De G., McG. & G. 604; Pomeroy's Equity Jurisprudence, 775.

[2] Counsel for the respondent, by oral argument and brief, insist that the contract involved here, providing for the supplying of electric

current to enable the respondent to operate its street railroad, is against public policy, and that, this being the case, a court of equity will not enforce such a contract. The contention is that the respondent is a public service corporation, and is bound by its charter to serve the public as a common carrier of passengers; that the contract between the respondent and the complainant, the basis of this suit, is an attempt to surrender or delegate the duties imposed upon respondent to another; and that therefore the contract is against public policy and void. Of course, no court will lend its aid to the enforcement of an executory contract entered into by a corporation which is ultra vires or against public policy. This is the real gist or principle of the decisions referred to by respondent's counsel. Notably this is true in Thomas v. Railroad Co., 101 U. S. 71, 25 L. Ed. 950, a leading case on the subject. There the court decided, Mr. Justice Miller delivering the opinion, that a contract by which a corporation renders itself incapable of performing its duties to the public, imposed upon it by its charter, or attempts to absolve itself from its obligations to the public and the state, without the consent of the state, violates its charter, that public policy forbids it so to act, and that its actions of this nature are void. This case is often referred to in subsequent decisions of the Supreme Court. The principle there declared is not hostile to the opinion now entertained by this court. Branch v. Jesup, 106 U. S. 478, 1 Sup. Ct. 495, 27 L. Ed. 279; Oregon v. Oregonian Ry. Co., 130 U. S. 1, 9 Sup. Ct. 409, 32 L. Ed. 837; Pennsylvania Ry. Co. v. St. Louis, 118 U. S. 290, 6 Sup. Ct. 1094, 30 L. Ed. 83; Central Trans. Co. v. Pullman Palace Car Co., 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55; Beasley v. Texas Pacific Ry. Co., 191 U. S. 492, 24 Sup. Ct. 164, 48 L. Ed. 274; Texas & Pacific Ry. v. Marshall, 136 U. S. 393, 10 Sup. Ct. 846, 34 L. Ed. 385; Pope Mfg. Co. v. Gormully, 144 U. S. 237, 12 Sup. Ct. 632, 36 L. Ed. 414. Fully recognizing the legal principle enunciated in the cases just cited, the court is of opinion that it is not applicable to the present case.

By the respondent's charter it assumed the duty of serving the public as a common carrier of passengers in and about the city of Montgomery. The contract here under consideration, by the terms of which the power company was to furnish to the street railway company current for propelling and lighting, and thereby operating, its cars, in order to comply with its charter rights and duties, cannot be construed to be a delegation by the respondent street railroad company to the complainant power company of the duty of the respondent as a common carrier of passengers. On the contrary, it is evident that such contract merely provided a means by which respondent was to perform the duty imposed upon it by its charter and the discharge of which it owed the public. The street railroad company, the respondent, could have erected and maintained its own power plant, and could have purchased from the operators of coal mines fuel to generate electric current; and it had the option, and the lawful right, to enter into a contract with the power company to buy and get its power direct for propelling its street cars, etc. In other words, it was not in contravention of public policy or ultra vires its charter for the street railroad company, the respondent, to acquire the means or power of propelling its street cars, either

by building a plant, buying coal, employing the necessary labor, and generating the current itself, or by buying the current from some one else.

[3] The respondent says that the contract entered into between the complainant and the respondent on January 30, 1909, is void and unenforceable upon the ground that at the time it was entered into complainant did not have on file with the Secretary of State of Alabama an instrument in writing designating an agent at its known place of business in Alabama on whom process could be served as required by the laws of said state. Section 232 of the Constitution of Alabama is as follows:

"No foreign corporation shall do any business in this state without having at least one known place of business and an authorized agent or agents therein, and without filing with the Secretary of State a certified copy of its articles of incorporation or association. Such corporation may be sued in any county where it does business, by service of process upon an agent anywhere in the state. The Legislature shall, by general law, provide for payment to the state of Alabama of a franchise tax by such corporation, but such franchise tax shall be based on the actual amount of capital employed in this state. Strictly benevolent, educational, or religious corporations shall not be required to pay such a tax."

, Section 3642 of the Code of Alabama of 1907 is as follows:

"3642. (1316) Foreign Corporation must File Instrument of Writing Designating Agent and Place of Business in This State.—Every corporation not organized under the laws of this state shall, before engaging in or transacting any business in this state, file an instrument of writing, under the seal of the corporation and signed officially by the president and secretary thereof, designating at least one known place of business in this state and an authorized agent or agents residing thereat; and when any such corporation shall abandon or change its place of business as designated in such instrument, or shall substitute another agent or agents * * * designated in such instrument of writing, such corporation shall file a new instrument of writing as herein provided, before transacting any further business in this state."

The evidence shows that the complainant in 1903 filed with the Secretary of State of Alabama a proper instrument designating W. F. Vandiver as its agent at its known place of business in Alabama, which agent had died before the execution of the contract of January 30, 1909, purporting to cancel the contract with the original Montgomery Traction Company, and reinstating the contract between the Montgomery Light & Power Company and the Montgomery Street Railway Company, and declaring the latter contract to be the only one in force between complainant and respondent. This instrument designating Vandiver was the only one on file with the Secretary of State (the officer named in the statute), although on April 24, 1907, complainant had filed with the State Auditor a document certifying that Robert J. Chambers was its agent. As stated, Vandiver died, on December 8, 1908, and complainant did not file another such instrument with the Secretary of State until June 11, 1909, at which time it duly filed an instrument as required by the Alabama laws designating said Chambers as its agent. Chambers was the first vice president and general manager of the complainant, and was in the active management of its business for a long time prior to the death of Vandiver and the filing of the instrument designating him, Chambers, as complainant's agent.

As before stated, at the time of entering into this contract of January 30, 1909, there was then in existence the contract made December 13, 1902, with the Montgomery Street Railway Company and the contract made by complainant with the Montgomery Traction Company on March 19, 1903, and the terms of said contracts were in all essential particulars the same, with two exceptions, one relating to the quantity of the voltage, and the other to the amount of liquidated damages. So far as such damages were concerned the contract of December 13, 1902, was more favorable to the street railway company. This contract provided that the power company should supply current not "exceeding 550 volts," and this contract further provided that when the power company failed or refused—

"to supply the current hereinbefore agreed to be supplied, * * * it shall and does hereby agree to pay the street railway, as liquidated damages, the sum of three hundred dollars per day of twenty-four hours, and at the same rate for any fractional part of the day during the period of such failure."

Whereas, the contract of March 19, 1903, stipulated that the power company should supply current in voltage "between 550 and 600 volts," as the traction company might require, and for any failure on the part of the power company—

"for more than four hours to supply the traction company with current in accordance with the terms of this contract, the power company shall forfeit and pay to the traction company the sum of one hundred dollars per day as liquidated damages for each and every failure on its part, which sum the traction company is hereby authorized to retain and deduct from any payment that may be due or to become due to the power company hereunder."

It is doubtful whether or not, under the pleadings in this case, the court is now called upon to pass upon this question. This ground of defense was interposed and set forth in the fourth paragraph of the answer filed by the respondent on December 23, 1911. On January 8, 1912, the complainant filed exceptions to this answer. The first of these was directed specifically to that portion of paragraph 4 of respondent's answer which set up the fact that at the time of the entering into of this contract of January 30, 1909, complainant did not have on file with the Secretary of State of Alabama an instrument in writing designating an agent at its known place of business in Alabama. Upon the submission of the case to the court, upon the exceptions filed to the answer, Judge Jones, then the judge of this court, sustained the exceptions directed to the averments setting up this ground of defense, and, in passing upon the exceptions filed March 11, 1912, used the following language:

"In making this ruling the court is of opinion that, if the complainant was fully complying with the terms of its contract at the time the defendant attempted to rescind the same, breaches prior thereto, for which the defendant may have had the right to rescind it, and did not do so, are not a good defense to the action, if complainant was then, in fact, complying with the terms of its contract."

In view of this ruling, it would appear that this question should not be taken into consideration as constituting one of the issues of law and fact now to be passed upon.

Pretermitting such a conclusion, however, let us state the relations of the parties, this complainant and this respondent, at the time the contract of January 30, 1909, was entered into and subsequent thereto. Prior to January 30, 1909, the two contracts were in force and operation, and they were, in every essential particular, except as to voltage and liquidated damages, the same. These differences have been hereinbefore stated. On January 30, 1909, the street railroad companies had been consolidated into one company, as heretofore stated, and this company took the place of the two companies named in the two separate contracts, that of December 13, 1902, and that of March 19, 1903. The new or consolidated company, standing in the place of both of these companies, was the possessor of both contracts and all the rights thereunder. These contracts were inconsistent, in the matter of the voltage to be supplied, and in the matter of liquidated damages to be awarded. After the contract of January 30, 1909, was entered into, the voltage was supplied on a basis of 550 volts (as per the contract of December 13, 1902), and not between 550 and 600 volts (as per the contract of March 19, 1903), and the liquidated damages were on the basis of $300 per day (as per the contract of December 13, 1902), and not $150 per day (as per the contract of March 19, 1903). For the many claims for interruptions that had been made the parties settled on the basis of $300 per day, as provided in the contract of December 13, 1902. The evidence further shows that claims for liquidated damages continued to be made by the parties, and settlements continued to be had of these claims according to the terms of the contract of December 13, 1902, up to the filing of the original bill herein on September 30, 1911.

Admitting, for the sale of argument, that on account of the failure of the complainant to comply with the statute of Alabama, relating to the designation of an authorized agent, the contract of January 30, 1909, was void and did not establish any rights of the parties thereto, still this contract of January 30, 1909, is evidence of a mutual understanding between the parties, and contained recitals which could be looked to for the purpose of clarifying any inconsistency or ambiguity as to the rights of the parties that arose by reason of there being in existence two separate contracts between them relating to the same subject-matter and differing as to the matter of liquidated damages to be allowed. In addition to this there is undisputed evidence showing a continuous recognition on the part of both parties of the force and operation of the contract of December 13, 1902, which resulted in a practical construction by themselves of what was considered their rights under the contract which had been previously made. And surely, if the contract of January 30, 1909, is a nullity, it cannot be looked to to abrogate the contract of December 13, 1902, under which the parties, as a matter of fact, continuously acted and dealt with each other.

Contracts and dealings between natural persons, or corporations, until completely executed, are open to ·change or modification, and such change or modification requires no other consideration to uphold it than the agreement of the parties. *Such agreement may not necessarily be expressed, but may be implied from the circumstances and the conduct of the parties.* Decatur B. & I. Co. v. Neal, 97 Ala. 717,

721, 12 South. 780; Sheffield F. Co. v. Hull C. & C. Co., 101 Ala. 446, 477, 14 South. 672; Chicago v. Sheldon, 9 Wall. 50, 54, 55, 19 L. Ed. 594.

It is not disputed that the two contracts, that of December 13, 1902, and that of March 19, 1903, made prior to the death of Vandiver, the designated agent, were valid. The subsequent failure of the complainant to name another agent, or the failure to subsequently comply with the Alabama law, could not, and did not, affect the existing contracts. See S. S. & L. Ass'n v. Elbert, 153 Ind. 198, 54 N. E. 753. In other words, the contracts, having been made in compliance with the statute requiring a designated agent, were binding and existing prior to the death of Vandiver, the designated agent, and the making of an agreement between the parties, determining by which one of the two contracts they were subsequently to be bound, if void because there was no designated agent in the state at the time of the making of this subsequent contract or agreement, then the original contract remained in force. This agreement, even if void, did not terminate the contracts which had been lawfully entered into and had not otherwise been terminated. Savings Inst. v. Michael, 81 Md. 487, 32 Atl. 189, 340, 33 L. R. A. 628, and note; Bernhisel v. Firman, 89 U. S. (22 Wall.) 170, 178, 179, 22 L. Ed. 766.

As we have said, the voltage prescribed in the contract of December 13, 1902, was 550 volts, and that of March 19, 1903, for 550 to 600 volts, and the former contract provided that liquidated damages should be fixed at $300 per day; whereas, under the latter, they were fixed at $150 per day. In these respects one or the other of the contracts must prevail, for they both could not operate in these particulars at the same time. This contract of January 30, 1909, is not a novation, but is in legal effect nothing more than a mere election or a *verbal recognition* that the contract of December 13, 1902, and not that of March 19, 1903, should prevail in the matter of voltage and in the matter of liquidated damages, and the conduct of the parties after having entered into the contract of January 30, 1909, constituted *acted recognition* of the force and operation of this contract of December 13, 1902.

Again, and finally, if the agreement of December 13, 1902, is void, the subsequent conduct of the parties fixed their status under the contracts with the Montgomery Street Railway Company (the respondent, as its legal successor) and the complainant, and both parties to the controversy are bound thereby. Hertz v. Montgomery Journal P. Co., 9 Ala. App. 178, 62 South. 564; Southern Bitulithic Co. v. Hughston, 177 Ala. 559, 58 South. 450.

In Pine River Logging Co. v. United States, 186 U. S., at page 290, 22 Sup. Ct., at page 924, 46 L. Ed. 1164, it is said:

"Defendants' main reliance, however, is upon the construction of these contracts by the parties themselves, including the United States, and in support of their position they invoke the general rule that where both parties to a contract have by their subsequent conduct given it a construction different from what the law might have given it, the courts will adopt that construction. * * *"

In Insurance Co. v. Dutcher, 95 U. S. 269, 273 (24 L. Ed. 410) the court, recognizing this rule, said:

"The practical interpretation of an agreement by a party to it is always a consideration of great weight. The construction of a contract is as much a part of it as anything else. There is no surer way to find out what parties meant than to see what they have done. Self-interest stimulates the mind to activity and sharpens its perspicacity. Parties in such cases often claim more, but rarely less, than they are entitled to. The probabilities are largely in the direction of the former. In considering the question before us, it is difficult to resist the cogency of this uniform practice during the period mentioned, as a factor in the case."

In Huntting Elevator Co. v. Bosworth, 179 U. S. 415, 435, 21 Sup. Ct. 183, 192 (45 L. Ed. 256), it is declared:

"The dealings and conduct of the parties in executing the contract dispel all question as to the proper interpretation to be given it."

See, also, Topliff v. Topliff, 122 U. S. 121, 131, 7 Sup. Ct. 1057, 30 L. Ed. 1110, and Lowrey v. Hawaii, 206 U. S. 206, 215, 27 Sup. Ct. 622, 51 L. Ed. 1026.

I conclude, therefore, irrespective of whether the complainant was, at the time of entering into the contract of January 30, 1909, remiss in not having filed with the Secretary of State an instrument in writing designating an agent at its known place of business in Alabama, the conduct of the complainant and the respondent running over a period of some years, continuously recognizing the existence of only one of the original contracts, and uniformly treating the other as if it were rescinded, and said contract of January 30, 1909, being at least evidence of what was the intention of and declaration on the part of the parties, that it is not now open to the respondent to say that the contract of December 13, 1902, was not in force at the time of the filing of the bill or at this time.

Having determined that the principles of equity involved in this case are with the complainant, and that it has the right to maintain this suit, provided, of course, that the facts averred in its pleadings are sustained by the evidence, we are brought to a consideration of the report of the special master and the exceptions thereto.

The order of reference, made by the former judge of this court, contained the following provision:

"It is ordered by the court as follows: (1) Phares Coleman, Esq., is hereby appointed special master, to whom the above cause is referred to take the evidence and to make report thereof to the court, and he is directed to take such testimony as may be offered by either of the parties upon the several issues involved therein, and to report his findings of fact thereon to the court at the earliest reasonable time practicable, together with a transcript of the evidence introduced by the parties. * * * (4) After the evidence introduced shall have been taken, the special master shall make a full report to the court of his findings of fact upon the issues involved, and copies thereof shall be delivered to the several counsel for the complainant and the respondent, respectively."

The special master began the taking of the testimony on July 15, 1912, and proceeded from time to time, completing such taking February 14, 1913. The examination of the witnesses covered a wide field of inquiry, as shown by the report and the transcript of the evidence. Much of the testimony was of necessity highly technical, and comprises several large volumes of nearly 2,000 pages, besides a great number of exhibits. The report was filed in the court July 3, 1913. The duties

imposed upon the special master were industriously and ably performed, which fact is attested by his well-considered, comprehensive, and plain report.

The court has carefully considered each of respondent's exceptions to the report of the special master, together with the exhibits attached to such exceptions, and the testimony and exhibits introduced before the special master, and has come to the conclusion that none of said exceptions to the report of the special master is well founded. It would serve no good purpose to discuss in detail the separate exceptions and the evidence bearing thereon, inasmuch as the court is satisfied that the evidence introduced sustains the report of the special master and is sufficient to overturn the exceptions.

This conclusion is reached without regard to the rules and practice and the decisions of the Supreme Court, which hold that the master's report is prima facie correct and that exceptions thereto will not be sustained unless error is clearly shown. Metzker v. Bonebrake, 108 U. S. 66, 2 Sup. Ct. 351, 27 L. Ed. 654; Girard Life Ins. Co. v. Cooper, 162 U. S. 529, 16 Sup. Ct. 879, 40 L. Ed. 1062. Suffice it to say the evidence shows to the reasonable satisfaction of the court that, at the time the respondent attempted to rescind the contract under which it was being supplied with electric current by the complainant, the complainant had fully complied and was complying with the terms of the contract. In addition to this, the court also finds that the apparatus of the complainant, for furnishing power to the respondent, under the contract here involved, measures up to the requirements of the contract, and has been kept and maintained by the complainant in such condition and so operated as to make the supply of current furnished to the respondent as effective, satisfactory, and reliable as possible. In other words, the court finds that the complainant has, on its part, complied in every particular with the contract, and that the respondent had no just cause to rescind it.

The last exception, filed by the respondent to the special master's report, is addressed to that portion of the report which ascertains the amount of the liability from the respondent to the complainant for current furnished for the month of September, 1911, and each of the months thereafter, down to and including January, 1913, and raises the contention that the ascertainment of any indebtedness from the respondent to the complainant was not referred to the special master. It is manifest that under the order of reference the special master was directed to take such testimony as might be offered by either of the parties upon the several issues involved in the case, and to make report to the court upon his findings upon the issues and facts. The supplemental bill was filed January 8, 1913, in which complainant asked that respondent be required to account to it and pay for the current furnished during the month of September, 1911, and since the filing of the original bill. The respondent answered, making a general denial. However, prior to that time the complainant had filed its petition praying for the ascertainment of this amount. It is also evident from the record that counsel for the respondent, in the examination of the witnesses, treated this as one of the issues involved in the reference before the master, and as within his province to determine.

Aside from this, however, under the evidence adduced, the correctness of the special master's finding of the amount due by the respondent to the complainant for current furnished during the period referred to cannot be doubted, inasmuch as it involved nothing more than a calculation of the amount due, with interest, upon bills rendered and which were not disputed by respondent. Clearly, it is the province of the court, upon ascertaining the correctness of such calculation, to adopt the same.

A decree will be entered in accordance with the views herein expressed.

### On Motion for Modification of Final Decree.

[4] The complainant sought by the original bill the specific performance of the contract between the complainant and the respondent, and by the supplemental bill an accounting for the indebtedness accruing under the contract subsequent to the filing of the original bill.

The decree adjudged that, upon every material issue of law and fact presented by the pleadings and evidence, the complainant was entitled to the relief prayed for in the original bill as amended and in the supplemental bill. Further and specifically the decree states (1) that the several exceptions of the respondent to the master's report are overruled and the report is confirmed; (2) that the complainant have the relief prayed for in the original bill as amended and in the supplemental bill, and that the respondent, its officers and agents, be perpetually enjoined from taking electric current from any person, firm, etc., other than the complainant, during the time covered by the contract, and so long as the complainant performs its part of the contract; (3) that the complainant have and recover of the respondent $78,064.72, being the amount ascertained by the court to be due as principal for current furnished to the respondent up to the 1st day of February, 1913, together with the interest thereon, which principal and interest were ascertained to be $93,613.75, and for this sum execution was ordered; (4) that this cause be retained in the court in order that the complainant might have an accounting from the respondent for all amounts that have accrued since February 1, 1913, and that may hereafter accrue, for current furnished and to be furnished under the contract between the parties, and complainant was given leave to apply to the court for such further and other orders as might be necessary in the premises; and (5) that the complainant have and recover of the respondent all costs, etc.

The respondent moves to modify the decree by striking therefrom so much thereof as ascertains and awards the amount of money due by the respondent up to the 1st day of February, 1913, or to stay the execution for the collection of this amount until the court shall hereafter render a decree ascertaining the entire amount due and to become due down to the time when the contract, the specific performance of which has been decreed, shall be ended, and bases the motion upon the contention that the decree is interlocutory, and that therefore execution is not a proper process for the collection of the amount which has been found to be due to the complainant by the respondent up to the 1st day of February, 1913, and that, because the decree is interlocu-

tory, as the respondent contends, the respondent is deprived of the right to supersede the decree for said sum of money and to obtain a review of it by the Circuit Court of Appeals.

After having heard the oral arguments of the counsel for the respondent and the complainant, and after having considered and read the authorities cited in the briefs, I entertain no doubt that the decree is a final one, and that an appeal will lie from it, and that the appellate court will review the case on its merits.

The main purpose of the suit has been accomplished, in that the specific performance of the contract has been decreed. The cause is retained in the court solely for the purpose of having a further accounting for the electric current furnished to the respondent by the complainant since the 1st day of February, 1913, according to the terms fixed in this contract. This accounting is no more than an *inseparable incident* to the performance of the contract which has been decreed. The bill was filed September 30, 1911. The special master took the testimony in the case and found the amount due each month, from and including September, 1911, and down to and including January, 1913, to be $78,064.72, averaging $4,592 per month. Under the contract the complainant is required to furnish and the respondent to receive the current or power, and the respondent is required to pay on the 5th of the month for the current or power furnished to it during the preceding month. It certainly would not be in conformity to the contract, nor would it be equitable, to postpone these monthly payments until the contract is ended February 1, 1918. I entertain no doubt that the litigation of the parties as to the merits of the case is terminated by the decree here sought to be modified, and that nothing now remains to be done but to carry into effect what has been decreed, namely, the specific performance of the contract, and, as a necessary incident thereto, payment for the electric current according to the terms of the contract. The fact that the cause is retained for an accounting for the electric current or power furnished by the complainant to the respondent under the contract, pending the litigation, and for such as complainant may hereafter furnish, does not change the character of the decree from a final to an interlocutory one. As I have stated, the cause is retained in the court solely for the purpose of carrying the final decree, which fully and finally determines the rights of the parties, into execution.

In Thomson v. Dean, 7 Wall. 342, 19 L. Ed. 94, the bill sought to require certain shares of stock to be transferred on the books of the company to the complainants in specific performance of the contract. The decree directed this transfer, and, further, that an account be taken and stated of the amount paid and to be paid for the stock and as to dividends accrued and to be credited under the contract. There it was contended, as it is here, that the decree was not final, because it left undetermined the state of the account between the parties. In that case (Thomson v. Dean) the court applied the rule laid down in Forgay v. Conrad, 6 How. 204, 12 L. Ed. 404, and on page 346 of 7 Wall. (19 L. Ed. 94) the opinion quotes from the latter case as follows:

"When the decree decides the right to the property in contest, and directs it to be delivered up by the defendant to the complainant, or directs it to be

sold, or directs the defendant to pay a certain sum of money to the complainant, and the complainant is entitled to have such decree carried immediately into execution, the decree must be regarded as a final one to that extent, and authorizes an appeal to this court, although so much of the bill is retained in the Circuit Court as is necessary for the purpose of adjusting by further decree the accounts between the parties pursuant to the decree passed."

The court then further said:

"The reasoning in the case just cited fully vindicates this rule, in our judgment, as a sound construction of the acts of Congress relating to appeals, and is sustained by the authority of several decisions. And it is quite clear that the appeal under consideration is within this rule. The decree for which it was taken decided the right to the property in contest, directed it to be delivered by defendant to complainant by transfer, and entitled the complainant to have the decree carried immediately into execution, leaving only to be adjusted accounts between the parties in pursuance of the decree settling the question of ownership."

In Winthrop Iron Co. v. Meeker, 109 U. S. 180, 3 Sup. Ct. 111, 27 L. Ed. 898, the bill sought to set aside as fraudulent the proceedings of a stockholders' meeting and to have a receiver appointed. It was decreed that the meeting was fraudulent, that the lease executed in accordance with the authority then given was void, that a receiver should be appointed with power to continue the business, and that an account be taken of the profits realized from the use of the leased property and from royalties derived from ores mined by the defendants. There it was contended that the decree was not final, because it left undetermined the account to be taken of profits derived from the use of the leased property and from royalties upon certain ores mined. It was held, on appeal, that the decree was final, because the main purpose of the suit had been accomplished, and that the accounting was ordered in aid of the execution. The court said:

"The accounting ordered is only in aid of the execution of the decree, and is no part of the relief prayed for in the bill, which contemplated nothing more than a rescission of the authority to execute the fraudulent lease, or a cancellation of the lease if executed, and a transfer of the management of the affairs of the company from a board of directors, whose personal interests were in conflict with the duty they owed the corporation, to some person to be designated by the court. The litigation of the parties as to the merits of the case is terminated, and nothing now remains to be done but to carry what has been decreed into execution. Such a decree has always been held to be final for the purpose of an appeal. Bostwick v. Brinkerhoff, 106 U. S. 3 [1 Sup. Ct. 15, 27 L. Ed. 73], and the cases there cited."

See, also, the following authorities: McGourkey v. Toledo O. C. R. R. Co., 146 U. S. 536, 13 Sup. Ct. 170, 36 L. Ed. 1079; West v. East Coast C. Co., 113 Fed. 742, 51 C. C. A. 416; Chase v. Driver, 92 Fed. 783, 34 C. C. A. 668; Grant v. E. & W. R. R. Co., 50 Fed. 795, 1 C. C. A. 681.

I have carefully examined the cases relied upon in support of the motion, and I do not find that they are opposed to the cases which I have referred to and quoted from. While there are expressions to be found to the effect that the whole litigation must be disposed of in order for the decree to be a final one, yet an examination of each case cited for respondent will reveal the fact that this means nothing more than that all of the equities and the rights of the parties, as pre-

sented by the pleadings in the cause, must be determined. And whenever a decree does determine the equities of a bill and the issues presented by it, the decree is a final one, notwithstanding the cause may be retained for an accounting between the parties and an accounting ordered in aid of the execution of the decree.

Of course, fairness and justice require that the respondent be not deprived of the right to have a review of the action of this court. But, as I have said, I am satisfied that the decree heretofore rendered in this cause is a final decree, and that upon appeal the action of the court will be fully reviewed.

The further contention is made that the decree awarding an execution for the sum ascertained to be due, in response to the issues presented and determined under the supplemental bill filed in this cause, violates equity rule No. 8 (198 Fed. xxi, 115 C. C. A. xxi). I have carefully examined this rule, and it is clear to my mind that complainant is entitled to an execution to enforce the collection of the amount adjudged to be due it, in aid of the execution of the final decree adjudging complainant's right to have the contract performed by the respondent.

The motion to modify the decree heretofore rendered in this cause on December 1, 1914, must be denied, and a decree will be entered accordingly.

NOTE.—The United States Circuit Court of Appeals at New Orleans, La., about December 15, 1914, refused to issue a mandamus to Judge Clayton requiring him to modify this decree; this court holding, as Judge Clayton did, that the decree was final.