803 F.2d 722
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee
v.
JOHN HENRY ADAMS, JR., and WILBERT LEON SMITH, JR.,
Defendants-Appellants.
 No. 85-1330.
 No. 85-1338.
 United States Court of Appeals, Sixth Circuit.
 Sept. 22, 1986.
 
 Before: KEITH and MERRITT, Circuit Judges; and CONTIE, Senior Circuit Judge.
 MERRITT, Circuit Judge.
 
 
 1
 Defendant Smith challenges his convictions on federal drug charges in connection with the importation and possession of a quantity of heroin from Pakistan. Defendant Adams challenges his conviction on one charge of possession of heroin.
 
 I.
 
 2
 The facts, as established at trial by testimony and numerous audio tape recordings, are as follows. In November 1982, a group of people in Pakistan agreed to have Shergul Khan transport heroin for them to the United States. In December 1982, Mr. Khan was given seven kilograms of heroin. He was told that his destination was Detroit, Michigan, and he was given a code name (Javed Hassan) for his American contact, a serial number from a one dollar bill, and two telephone numbers to use to contact the buyer. Upon delivery Khan was to receive the dollar bill with the serial number as proof of delivery. Shergul Khan was told that he would receive $40,000 for making the delivery.
 
 
 3
 Shergul Khan is a full-time DEA informant. The two telephone numbers given to Khan were the home phone and business phone numbers of defendant Smith in Detroit. The government tapped Smith's telephones and placed him under surveillance. Mr. Khan turned the heroin over to the DEA. DEA agents prepared 14 packages each of which contained only one gram of real heroin. Khan took these 14 packages to the United States.
 
 
 4
 Mr. Khan arrived in Detroit on January 15, 1983. He called one of the two numbers he had been given. Defendant Smith answered at his home, and when Shergul Khan asked for Javed Hassan, Smith said Hassan was "here." Smith gave Shergul Khan a third telephone number and told him that Hassan could be reached there in one-Half hour. After hanging up, Smith called a room at the Westin Hotel in Detroit. He spoke with Abdul Waheed, asked to speak to Sarwar Khan, and told Sarwar Khan to return to his apartment because Mr. Javed would be calling within half an hour.
 
 
 5
 In half an hour Shergul Khan called the number Smith had given him, which belonged to the apartment to which Smith told Sarwar Khan to return. Sarwar Khan answered. Shergul Khan asked for Mr. Javed, and Sarwar Khan said, "Yes, I'm him speaking. Do you recognize me Shergul? I'm Sarwar speaking." They discussed the delivery of a "letter" that Shergul Khan had brought, and Sarwar Khan stated that the sooner they completed the delivery, the better for everyone.
 
 
 6
 Later, Shergul Khan tried to call Sarwar Khan several times at this number but could not reach him. On January 17, Shergul Khan called Smith again at his home. Shergul Khan told Smith that there was a "package" to be delivered and that Shergul Khan was to receive something for delivering it. Smith said that Shergul Khan should call him back at his office number, which was the second number Mr. Khan had received in Pakistan. Smith also said that he would try to locate Sarwar Khan. In a later call that day, Smith offered to help Shergul Khan with his delivery by calling Pakistan and learning more about the delivery. Still later, Smith told Shergul Khan, "I'm talking to Pakistan right now . . . we're working it out now . . . he'll be calling you as soon as I get through talking to him."
 
 
 7
 After speaking with Smith, Shergul Khan called some of the people he had dealt with in Pakistan, who told him that Smith was the contact man and that Shergul Khan should deliver the "carpets" to him. Shergul Khan was told to give Smith the code name "Shakeel" and to shake his left hand. The Pakistanis stated that Smith was "their own man, he is the right person. . . if you deliver him the thing . . . he will give you forty thousand." In a subsequent call to Pakistan, Shergul Khan was told that Javed Hassan and Sarwar Khan were the same person, that Smith was the "right person," that Smith would contact Shergul Khan, and that Smith's car telephone number was 237-2234.
 
 
 8
 On January 16, 17, and 18, authorities stopped and searched three Pakistanis at the Detroit airport. Among them were Abdul Waheed and Mafoos Rizvi. They were carrying large sums of cash -- $83,000; $10,220; and $1,085 -- a receipt for $83,000 signed by Smith, and a key to an apartment rented by Smith. On January 19, Rizvi called Smith and told him that he had been stopped at the airport and had denied knowing Smith but that the authorities had found Smith's name and number in Rizvi's diary. Smith chastised Rizvi for lying. He said "you are a subscribed member of my corporation here to -- you know."
 
 
 9
 On January 25, Shergul Khan learned from a member of the Pakistani group that Smith had been in hiding because the men had been stopped at the airport but that the "deal is done now," and Shergul Khan could call Smith to complete the deal. When Shergul Khan called Smith, Smith said that he needed to get the dollar bill's serial number, and then arrangements would be made. Smith later told Shergul Khan to stay out of Detroit and that Smith would send his representative to Khan because the other men had been detained at the airport.
 
 
 10
 At some time in this chain of events, Shergul Khan went to Cleveland, Ohio/where he stayed at a hotel. Subsequently, Smith gave Shergul Khan the code name, Shakeel, read the serial number to him,[1] and directed him to call the "general manager" in Pakistan to verify the deal. On January 30, Smith called Shergul Khan in Cleveland and told him that Smith would be there at 5:15 pm and that Shergul Khan would be able to "get out of there today."
 
 
 11
 At about 7:00 pm, Nannette Brown called Shergul Khan from the lobby of Khan's hotel. She said she was "from Detroit." Khan went to the lobby and met Brown and defendant Adams. Adams gave Khan the one dollar bill "receipt." The three went to Khan's hotel room where Brown showed Khan a bag of money that she said contained $40,000. Shergul Khan told Brown and Adams that he had the "clothes" with him. Brown and Adams had expected to get a key to a locked receptacle in Detroit where the heroin was to have been hidden. The three attempted unsuccessfully to contact Smith to clear up this misunderstanding. Brown and Adams refused to complete the deal without contacting Smith, and they left. Fifteen minutes later, Brown called Shergul Khan and said they had decided to take the heroin and complete the deal. Adams went back to Khan's room, gave Khan the money, and took the suitcase containing the heroin. DEA agents arrested Brown, Adams and Shergul Khan immediately after Adams left Khan's room. Smith was subsequently arrested in Michigan.[2]
 
 
 12
 In September 1984, a federal grand jury indicted Smith, Adams, Brown, and 10 other defendants on various drug related charges. Defendants were charged as follows:
 
 Count 1:
 
 13
 All defendants charged with conspiracy to import heroin in violation of 21 U.S.C. Secs. 960 & 963;
 
 Count 2:
 
 14
 All defendants charged with conspiracy to distribute, and to possess with intent to distribute, heroin in violation of 21 U.S.C. Sec. 841(a)(1);
 
 Count 3:
 
 15
 Defendants Smith, Adams, and Brown charged with possession with intent to distribute heroin in violation of 21 U.S.C. Sec. 841(a)(1) and aiding and abetting, 18 U.S.C. Sec. (a);
 
 Count 4:
 
 16
 Defendant Smith and a co-defendant charged with a second count of possession with intent to distribute heroin in violation of 21 U.S.C. Sec. 841(a)(1) and aiding and abetting, 18 U.S.C. Sec. 2(a);
 
 Counts 5-13:
 
 17
 Defendant Smith charged with unlawfully utilizing a communication facility in violation of 21 U.S.C. Sec. 842(b);
 
 Count 14:
 
 18
 Defendant Smith charged with engaging in a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848.
 
 
 19
 Brown pleaded guilty. Smith and Adams pleaded not guilty and were tried before a jury by Judge Gilmore in the Eastern District of Michigan in January and February 1985. Smith was found guilty on counts 1 (conspiracy to import), 2 (conspiracy to distribute), 3 (possession with intent to distribute), 8-13 (unlawful use of communications facility), and 14 (continuing criminal enterprise). He was found not guilty of one of the possession charges and two of the communication facility charges. Adams was found guilty on count 3, possession with intent to distribute or aiding and abetting, but was not found guilty of the two conspiracy charges. Smith and Adams appeal.
 
 II.
 
 20
 Smith claims that the evidence was insufficient to support his conviction on any of the counts. He challenges the admission of certain tape recordings as evidence, and he alleges prosecutorial misconduct.
 
 A. The Tape Recordings
 
 21
 Smith challenges the admission at trial of a large quantity of tape recordings and the use of transcripts of the recordings. Forty-nine tapes were admitted. Eleven of the tapes were from a wiretap on Smith's telephones, and 38 were from monitoring of calls on Shergul Khan's phone. Of these 49 tapes, 30 were in English, and 14 were in either of two Pakistani dialects.
 
 
 22
 Smith argues that the tapes were improperly admitted at trial because no foundation was laid for their admission, because Smith was never properly identified as being a speaker on the tapes, and because the tapes were hearsay. He does not argue that the government unconstitutionally recorded the conversations admitted at his trial.
 
 
 23
 1. Foundation. Smith did not object at trial to the alleged lack of foundation for any of these tapes. Therefore, under Fed. R. Evid. 103(a)(1), he cannot assign the lack of foundation as error on appeal. The Court could reverse, however, if the allegedly erroneous admission of evidence amounted to plain error. See Fed. R. Evid. 103(d). In this case, the alleged lack of foundation for the tape recordings was not plain error.
 
 
 24
 Judge Gilmore read the transcripts of the English tapes against the recordings and determined that the transcripts were accurate. See United States v. Robinson, 707 F.2d 872, 879 (6th Cir. 1983). A DEA agent testified that the tapes from the wiretap on Smith's home phone were accurate. See Fed. R. Evid. 901(a) ("The general requirement of authentication . . . as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."). The jury was allowed to read the transcripts of these tapes as the tapes were played in court, but the jury was instructed that the tapes, not the transcripts, were the evidence. Shergul Khan testified to the accuracy of the English tape recordings of his calls. The translators of the foreign language tapes testified that they had listened to the tapes and compared them to the translated transcripts and that they found them to be accurate.
 
 
 25
 Smith argues that some of the tapes (the English tapes made from Shergul Khan's phone calls) were never formally admitted as evidence. However, the tapes were subsequently treated, without objection, as admitted exhibits. Any error in this respect is harmless.
 
 
 26
 2. Identification. Smith argues that the admission of the tape recordings and the transcripts denied him a fair trial because the recorded voice alleged to belong to Smith was never properly identified as being Smith's voice. A DEA agent identified Smith's voice on the wiretap tapes.[3] The agent had met with Smith on three occasions for a total of about three hours, and he testified that he could recognize Smith's voice. Shergul Khan also identified Smith's voice, but apparently he had not heard Smith's voice except in the conversations for which identification was sought. He testified that he had "learned" that Smith was the speaker on the tapes, but he did not say how he had learned it.[4]
 
 
 27
 Smith did not object at trial to the alleged lack of voice identification, and the government again asserts that Smith has, therefore, waived this assignment of error. The government argues that voice identification need not be by a witness who has heard the alleged speaker's voice first hand. See Fed. R. Evid. 901(b)(5):
 
 
 28
 [T]he following are examples of . . . identification conforming with the requirements of this rule:
 
 
 29
 ----
 
 
 30
 Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.
 
 
 31
 The government admits that self-identification by the recorded speaker is not sufficient, but it argues that when the attending circumstances indicate the probable identity of the speaker, it becomes a question for the jury. See United States v. Hines, 717 F.2d 1481, 1491 (4th Cir. 1983) (self-identification by speaker on phone registered to defendant's parents, plus fact that defendant was present at parents' house when visited by DEA agent, adequately establishes that speaker was the defendant); Robilio v. United States, 219 F. 975, 982-83 (6th Cir. 1923) (self-identification as defendant by speaker using defendant's telephone call made to defendant's number held adequate).
 
 
 32
 In this case, Smith's voice on some of the tapes was identified by a DEA agent who knew his voice. As to the tapes made by monitoring Shergul Khan's calls, perhaps Mr. Khan could not identify Smith's voice from his own familiarity with Mr. Smith's voice. However, the speaker did identify himself as Mr. Smith, and the calls were made to numbers subscribed to by Mr. Smith. As evidenced by the fact that the DEA agent identified Shergul Khan's voice in some of the wiretap tapes, the government has double recordings of some of the conversations -- one recording from the wiretap and one from monitoring Shergul Khan's phone. See, e.g., J.A. at 219. The DEA agent's identification of Mr. Smith's voice on the wiretap tapes would also identify that voice on the recordings of the same conversations from Mr. Khan's phone. Mr. Khan could presumably identify the speaker in any other tapes as having the same voice as the person identified by the DEA agent. In this situation, the alleged defect in the identification of Mr. Smith's voice was not plain error.
 
 
 33
 3. Hearsay. Smith claims that the District Court improperly allowed the admission of hearsay statements in the tape recordings, the transcripts of the foreign language recordings, and the testimony of Shergul Khan. Smith has cited examples of this alleged hearsay in his brief, but he does not specify each of the statements that he claims are inadmissible hearsay. The recorded statements made by Smith are admissions by a party-opponent, which are specifically defined as nonhearsay by Fed. R. Evid. 801(d)(2). According to the government, Smith spoke on 25 of the 49 tapes admitted at trial.
 
 
 34
 The government argues that the remaining statements by extra-judicial declarants were not hearsay, because they were excepted from the definition of hearsay by Fed. R. Evid. 801(d)(2)(E), which provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay when offered against the party.
 
 
 35
 Under United States v. Enright, 579 F.2d 980 (6th Cir. 1978), the determination of whether an extrajudicial statement is a coconspirator statement under rule 801(d)(2)(E) is to be made by the court as set out in Fed. R. Evid. 104(a). Under Enright, the statement can be admitted (assuming it is relevant) as nonhearsay if the trial judge finds by a preponderance of the evidence that a conspiracy existed, that the defendant against whom the hearsay is offered was a member of the conspiracy, and that the hearsay statement was made in furtherance of the conspiracy. In Smith's case, Judge Gilmore found that the Enright standard was satisfied.
 
 
 36
 Smith argues that there was no evidence indicating that the statements in question were made in furtherance of a conspiracy in which Smith participated. Smith argues that Judge Gilmore should not have used the alleged coconspirators' statements in question in making the preliminary finding under rule 104(a). Smith recognizes that in United States v. Vinson, 606 F.2d 149 (6th Cir. 1979), this Court held that a trial court may consider the alleged hearsay statement as evidence of conspiracy in making the Enright decision.
 
 
 37
 Smith argues that his case can be distinguished from Vinson because in Vinson there was independent evidence of the conspiracy. In this case, he argues, the only evidence of the conspiracy is found in the hearsay statements by alleged coconspirators. Smith overlooks his own recorded statements. These would tend to support Judge Gilmore's Enright finding, and they are admissible under Fed. R. Evid. 801(d)(2)(A) as party admissions.
 
 
 38
 Smith also invites us to overrule Vinson which we have followed in numerous cases. See e.g., United States v. Hancock, 703 F.2d 982 (6th Cir. 1983)(per curiam). We decline Smith's invitation.
 
 B. Continuing Criminal Enterprise
 
 39
 The elements of a Continuing Criminal Enterprise violation under 21 U.S.C. Sec. 848 are: (1) the defendant committed a felony violation of federal narcotics law, (2) the violation was part of a continuing series of federal drug felony violations, (3) the violations were undertaken in concert with five or more people, (4) the defendant was an organizer, supervisor, or manager over the five other people, and (5) the defendant obtained substantial income from the enterprise.
 
 
 40
 Smith's convictions for conspiracy and possession satisfy the first element.[5] The government asserts that the "continuing series" requirement means a series of three related violations. The government argues that this requirement is satisfied because, as part of the conspiracy, four shipments of heroin were sent to Smith -- the one received in Cleveland by Adams and Smith and the three sent through the mail addressed to Smith's business. Supra note 2. The government cites United States v. Collier, 358 F. Supp. 1351 (.E.D. Mich. 1973), in which a CCE conviction was upheld in a case involving a single drug transaction.
 
 
 41
 The other attempted deliveries cannot constitute additional violations in a series, because the jury acquitted Smith and his codefendant on those charges; it evidently believed that Smith's conduct did not constitute a violation of federal drug law. However, a series of violations can be made out from Smith's several convictions in this transaction -- two convictions for conspiracy, one for possession, and six for unlawful use of communications facilities.
 
 
 42
 Smith argues that there was no admissible evidence that he acted in concert with five or more people over whom he was a supervisor or manager. The government argues that he was an organizer over Joanne Brown, defendant Adams, Shergul Khan, Sarwar Khan, Abdul Waheed, Mafoos Rizvi, Yousef Khan Khattuk, Haji Wazir Khan, Saifoor Khan, and the other Pakistanis with whom Smith conspired.
 
 
 43
 There is ample evidence for the conclusion that Smith was a manager over Brown and Adams. After Shergul Khan had dealt with Smith over the phone, Brown and Adams showed up to pay Khan and (they thought) to be told where the heroin was stashed. When Khan revealed that he had the heroin with him, Brown and Adams mentioned Smith by name and said they would have to call him to find out whether to accept the heroin.
 
 
 44
 Similarly, there is sufficient evidence to support the conclusion that Smith was an organizer over Sarwar Khan and Abdul Waheed. When Shergul Khan first called Smith and was told to call another phone number, Smith called Sarwar Khan and told him to go to the apartment where Shergul Khan would be calling. Abdul Waheed was also present when Smith called. Smith paid for the lodging of Waheed and Sarwar Khan in Detroit. When Abdul Waheed was stopped at the Detroit airport, he was carrying $83,000 and a receipt for that amount signed by Smith. Along the same line, Mafoos Rizvi was also stopped at the airport. He denied knowing Smith, but Smith's name and address were found in Rizvi's "diary." When Rizvi called to warn Smith, Smith chastised Rizvi for lying. This indicates that Smith was a supervisor over Rizvi.
 
 
 45
 Thus, section 848's "five or more" requirement is satisfied, and we need not decide whether Smith was a manager or supervisor over the other alleged participants in the scheme.
 
 
 46
 Additionally, Smith argues that there was no evidence that he derived substantial income from the criminal enterprise. The evidence showed that Smith's legitimate business ventures did not produce much income. There was evidence that Smith's attorney had instructed Smith's accountant to add $100,000 of income to Smith's 1982 tax return (money that allegedly came from Smith's fees for collecting money from party store owners for foreign investors). However, Smith's bank account showed cash deposits in January 1983 totaling $118,114 and in five months in 1982 totaling $280,000. Additionally, Smith evidently gave Abdul Waheed $83,000, and he sent $40,000 for Shergul Khan's courier fee. In short, the jury's conclusion on this point is supported by sufficient evidence in the record.
 
 C. The Conspiracy Counts
 
 47
 Smith asserts that there was insufficient evidence to convict him on either of the conspiracy counts. This claim depends on his earlier challenge to the tape recording evidence. Since, as we held above, the recordings were admissible, there is sufficient evidence supporting the conspiracy convictions.
 
 
 48
 Smith also argues that the conspiracy convictions are lesser offenses included in the continuing criminal enterprise conviction. The Government agrees. See Jeffers v. United States, 432 U.S. 137, 155 (1977). Therefore, the two conspiracy convictions and sentences should be vacated.
 
 D. The Possession Count
 
 49
 The evidence, as capsulized above, is sufficient to support Smith's conviction on charges of possession with intent to distribute the heroin received in Cleveland by Brown and Adams. This evidence leaves no reasonable doubt that Smith was in constructive possession of the heroin when Brown and adams took actual possession of it in Cleveland. See United States v. Brantley, 733 F. 2d 1429 (11th Cir. 1984) (constructive possession).
 
 E. The Communications Counts
 
 50
 As with the other counts, Smith's conviction on these charges stands or falls with the Court's ruling on the admissibility of the tape recordings. In this case, the conviction stands.
 
 F. Prosecutor Misconduct
 
 51
 We have reviewed Smith's allegation of prosecutorial misconduct, but we find no merit to Smith's claim.
 
 III.
 A. Venue
 
 52
 Defendant Adams was convicted under Count three of the indictment which reads:
 
 
 53
 That on or about January 30, 1983, in the Eastern District of Michigan, Southern Division, Wilbert Leon Smith, Jr., Joanne Nannette Brown, and John Henry Adams, Jr., defendants herein, did knowingly, intentionally, and unlawfully possess with intent to distribute and aid and abet each other in the possession with intent to distribute a quantity of heroin, a Schedule I, Narcotic Drug Controlled Substance in violation of Sections 841(a)(1), Title 21, United States Code.
 
 
 54
 At the close of the government's case, Adams moved for acquittal on grounds of improper venue. Judge Gilmore held that Adams had waived his venue argument because he had failed to raise it as soon as it became apparent from information obtained in discovery that the government was proceeding in Michigan on the basis of the heroin Adams had possessed in Ohio.
 
 
 55
 Adams now appeals, arguing that his trial in Michigan violated his sixth amendment right "to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed." U.S. Const. Amend. VI (emphasis added). Adams argues that because he possessed the heroin only in Cleveland, the crime must have been committed in Cleveland.
 
 
 56
 A criminal defendant may waive his sixth amendment venue rights by an express waiver, a motion to transfer, or (as the District Court held in this case) by inaction. See 2 C. Wright, Federal Practice and Procedure Sec. 306 at 220-21 (2d ed. 1982). Rule 12(b)(1) of the Federal Rules of Criminal Procedure provides that "[d]efenses and objections based on defects in the institution of the prosecution" "must be raised prior to trial."
 
 
 57
 Adams argues, however, that his failure to raise the venue defect before trial should not be considered a waiver because the venue defect was not apparent on the face of the indictment. He asserts that a waiver may be inferred from inaction only if the indictment is defective on its face. It is defective on its face if it alleges facts which, if proven, would not sustain venue in the district where the defendant is to be tried -- for example, an indictment issued for a trial in Michigan alleging that Adams possessed the heroin in Cleveland. Adams argues that if the indictment alleges facts that would, if established, sustain venue, a motion to dismiss for improper venue may be raised at any time up to the close of the government's case. See United States v. Bohle, 445 F.2d 54, 58-59 (7th Cir. 1971); see also United States v. Melia, 741 F.2d 70 (4th Cir. 1984); United States v. Black Cloud, 590 F.2d 270 (8th Cir. 1979).
 
 
 58
 In this case, Adams' indictment alleged that Adams possessed heroin (or aided and abetted in possession) in the Eastern District of Michigan. Thus, Adams argues, the venue defect was not apparent on the face of the indictment because the indictment alleged facts which, if proven, would have sustained venue in Michigan. Adams argues, therefore, that his failure to raise the venue problem prior to trial does not amount to a waiver.
 
 
 59
 The general rule is that a venue defect is waived if not asserted prior to trial. This rule's exception, which Adams claims, is premised on the idea that "when an indictment contains a proper allegation of venue so that a defendant has no notice of a defect of venue until the government rests its case, the objection is timely if made at the close of the evidence." Black Cloud, 590 F.2d at 272. Thus, the inquiry should not center on whether the indictment was defective on its face but rather on the question of whether the defendant had notice of the defect before trial. Such notice can obviously be obtained from a defective indictment, as in Bohles. But notice can also be obtained from other sources. See United States v. Semel, 347 F.2d 228 (4th Cir.), cert. denied, 382 U.S. 840 (1965)(bill of particulars showed venue was defective). Adams' trial counsel has conceded that he knew well before trial that the government was proceeding on the basis of Adams' possession of the heroin in Cleveland. He therefore had a duty to raise the issue prior to trial under Rule 12 rather than permit the Court to proceed to trial. Adams waived his venue claim by not raising it prior to trial.
 
 B. Sentencing Evidence
 
 60
 After Adams was convicted, but before he was sentenced, Judge Gilmore had the court reporter transcribe a statement made by Joanne Brown at the time she pleaded guilty. Adams received a sentencing memorandum and presentence probation report before the sentencing hearing. However, at the sentencing hearing, the judge read Ms. Brown's statement without allowing Adams to respond. Judge Gilmore indicated that the statement persuaded him that Adams had lied when he testified. The judge then sentenced Adams to five years incarceration with three years probation.
 
 
 61
 Adams concedes that the trial judge has wide discretion in accepting evidence at the sentencing stage of the trial, but he argues that this denial of any notice or opportunity to respond denied him due process. He cites authority holding that a "defendant has the right not to be sentenced on the basis of invalid information and he must be given the opportunity to rebut information specifically relied upon by the sentencing judge." United States v. Aguero-Segovia, 622 F.2d 131, 132 (5th Cir. 1980).
 
 
 62
 The government argues that Adams' due process rights have not been violated because he cannot show that the statement relied upon was materially false. Additionally, the government asserts that the statement's probative value on the question of whether Adams had lied was cumulative of the perception Judge Gilmore gained from trial. These arguments miss the point. Adams had a due process right to attempt to rebut information relied on by the trial judge in the sentencing decision. Since Judge Gilmore indicated that he was relying on Brown's statement, Adams is entitled to a new sentencing hearing. Of course, this ruling in no way compels the conclusion that after a new and proper hearing, Adams should necessarily receive a reduced sentence.
 
 IV.
 
 63
 Smith's convictions on the conspiracy charges are lesser included offenses of the continuing criminal enterprise charge. These convictions are hereby vacated. However, Smith's sentences on these charges were concurrent with other sentences, so Smith need not be resentenced. In other respects, Smith's convictions are affirmed.
 
 
 64
 Adams' conviction is affirmed. However, we hereby vacate Adams' sentence and remand for another sentencing hearing at which Adams should receive the opportunity to rebut Ms. Brown's statement if it is relied upon by the sentencing judge.
 
 
 
 [1]
 As it turned out, the number was off by two digits, but one of the group members from Pakistan told Shergul Khan to accept difference in numbers
 
 
 [2]
 At trial, the government introduced evidence of three other attempted deliveries of heroin. All three came by mail and were intercepted by customs and turned over to the DEA. The DEA removed all but one gram of the heroin from each package and attempted to deliver the packages to Smith. The government could not prove that any of the packages ever ended up in the hands of defendant Smith
 
 
 [3]
 The agent also identified the voices of Sarwar Khan, Abdul Waheed, and Shergul Khan
 
 
 [4]
 Smith also argues that the only identification of his voice in regard to some of the tapes was the notation in the transcripts that the speaker was Mr. Smith. The tapes in which Smith claims to have been identified only by transcript were recordings from Shergul Khan's phone. The prosecutor did not ask Mr. Khan to identify the voices in each tape as it played. Rather, he apparently had Mr. Khan identify the voices once and then played the tapes in series, each time asking if the recording accurately represented the actual conversation. Further, Smith challenges Shergul Khan's identification of the voices of the Pakistani speakers from the foreign language tapes. Smith argues that identification of these speakers is essential because they are Smith's alleged coconspirators and his alleged cohorts in a continuing criminal enterprise
 
 
 [5]
 Additionally, the rule from Pinkerton v. United States, 328 U.S. 640 (1977)(the act of one coconspirator in furtherance of an unlawful plan is the act of all), applies to continuing criminal enterprise cases. United States v. Gallo, 763 F.2d 1504 (6th Cir. 1985)